# No. 16-12218-C
# No. 20-13971-C
# No. 21-11311-C

---

**IN THE UNITED STATES COURT OF APPEALS
FOR THE ELEVENTH CIRCUIT**

---

**UNITED STATES OF AMERICA,**

*Plaintiff/appellee,*

**v.**

**MIAMARK, LLC, MURANO 908, LLC, COLLECTION MOTOR
SPORTS OF MADRID, ARTEMIO LOPEZ TARDON, KYTE SCHOOLL,
and MARIA TARDON TORREGO**

*Petitioners/Appellants.*

---

**On Appeal from the United States District Court
for the Southern District of Florida**

---

**APPELLANTS' INITIAL BRIEF**

---

**JACQUELINE E. SHAPIRO, ESQ.**
**Law Office of Jacqueline E. Shapiro**
**Counsel for Appellants**
**40 N.W. 3rd Street, PH 1**
**Miami, Florida 33128**
**Tel. (305) 403-8207**

# CERTIFICATE OF INTERESTED PERSONS
# AND CORPORATE DISCLOSURE STATEMENT

## United States v. Miamark, LLC, et al.
## Case Nos. 16-12218-C, 20-13971-C, and 21-11311-C

Appellants file this Certificate of Interested Persons and Corporate Disclosure Statement, listing the parties and entities interested in this appeal, as required by 11th Cir. R. 26.1.

Amster, Steven Edward

Brown, Hon. Stephen T.

Blumenfeld, Jack

Cardelle, Vincent

The Collection Motor Sports of Madrid

Dube, Hon. Robert L.

Ecarius, Daniel

Frazier, Brian

Ferrer, Wifredo A.

Galler, Brandy Brentari

Golembe, Stephen J.

Gonzalez, Jr., Juan A.

Goodman, Hon. Jonathan

**Certificate of Interested Persons (cont'd)**
***United States v. Miamark, LLC, et al.***
**Case Nos. 16-12218-C, 20-13971-C, and 21-11311-C**

Grove, Daren

Kleiner, Ron M.

Klugh, Richard C.

Krentz, Fabiani

Lazarus, Paul D.

Lenard, Hon. Joan A.

Lopez Tardon, Alvaro

Lopez Tardon, Artemio

Matzkin, Daniel

Maxwell, Cristina

McAliley, Hon. Chris M.

Miamark, LLC

Moreno, Hon. Federico

Mullenhoff, Jeanne

Murano 908, LLC

O'Sullivan, Hon. John J.

Pollack, David William

**Certificate of Interested Persons (cont'd)**
*United States v. Miamark, LLC, et al.*
**Case Nos. 16-12218-C, 20-13971-C, and 21-11311-C**

Raben, David

Rabin, Jr., Stephen J.

Salyer, Kathleen M.

Shapiro, Jacqueline E.

Sheehan, Evelyn

Srebnick, Howard

Smachetti, Emily M.

Sombunthan, Nalina

Spivak, Michael D.

Turnoff, Hon. William C.

Weisman, Kenneth

**STATEMENT REGARDING ORAL ARGUMENT**

Appellants respectfully submit that oral argument is necessary to the just resolution of this appeal and will significantly enhance the decision making process. The appeal raises important questions regarding the standing of innocent record title owners, including validly formed and legally-operated partnership entities, to assert ancillary claims for relief from forfeiture orders entered against a nonowner criminal defendant, where the property was found by the jury to be *untainted*, having no nexus to the criminal activity, and where the innocent owners themselves funded acquisition of the property. Oral argument is warranted given the fundamental due process and property rights at stake.

**TABLE OF CONTENTS**

CERTIFICATE OF INTERESTED PERSONS. . . . . . . . . . . . . . . . . . . . . . . . . . C-1

STATEMENT REGARDING ORAL ARGUMENT . . . . . . . . . . . . . . . . . . . . . . i

TABLE OF AUTHORITIES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . vi

STATEMENT OF JURISDICTION . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

STATEMENT OF THE ISSUES . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 1

STATEMENT OF THE CASE . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 2

    Course of Proceedings and Disposition in the District Court . . . . . . . . . . . . 2

    Statement of the Facts . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 12

STANDARDS OF REVIEW . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

SUMMARY OF THE ARGUMENT. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 21

ARGUMENT . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

    THE DISTRICT COURT ERRED IN DISMISSING, ON STANDING
    GROUNDS, THE ANCILLARY FORFEITURE PETITIONS OF THE
    RECORD TITLE OWNERS OF REAL ESTATE, AUTOMOBILES, AND
    OTHER BUSINESS PROPERTY . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 23

A.    The dismissal of The Collection's ancillary claim to untainted company
    property, consisting of eight automotive-themed wristwatches, was
    erroneously based on the government's misleading and untested claim
    that invoices provided to the car company by the watch seller did not

correctly identify the watches, despite substantial support in the record, including the seller's deposition testimony and evidence offered by the government in the criminal trial, that the watches at issue were in fact the items sold and invoiced to The Collection. . . . . . . . . . . . . . . . . . . . . . 23

B.     The district court erred in dismissing, on standing grounds, the ancillary forfeiture petitions of the record title owners of real estate—the appellant partnership entities, which undisputed evidence showed were validly formed and legally operated—where the court erroneously concluded that the partnerships' lawful use of a manager, who maintained the partnerships' assets and function without excess compensation or diminution of partner interests, meant that the partnerships lacked "dominion and control" over the assets. . . . . . . . . . . 27

    1.     The government's in rem theory that the properties were used for an improper purpose was barred by the jury's forfeiture decision (applying a civil preponderance of evidence standard), where the jury's determination was binding in the ancillary proceeding under forfeiture law and res judicata principles . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30

    2.     The district court's dominion and control theory was legally unfounded, failed to recognize that use of managers and counsel for LLC activities is not only lawful, but is encouraged under Florida law, and was misapplied, where the court failed to properly consider the law and evidence

favoring the rights, and showing the continued lawful existence, of the partnerships. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 33

3.    The district court employed a fundamentally erroneous, inapplicable theory of "bare naked title" that ignored and inaptly depicted the relevant facts (including undisputed evidence that the partners' own assets were used to purchase the properties, rather than resources of the defendant), the law of the case, and the law pertinent to standing for real estate owners, and in imposing a burden of proof as to standing that exceeded the statutory requirement to show a legal ownership interest, particularly absent any taint affecting the property . . . . . . . . . . . . . . . . . . . . . . 35

4.    The government's abandonment of alter-ego, nominee, and piercing-the-corporate-veil theories left no dispute as to the legal interest held, and thus the standing of, Appellants. . . . . . . . . . 38

5.    Even under the standard used for tainted property, Appellants satisfied the most restrictive standing test . . . . . . . . . . . 39

6.    The district court also erred in disregarding alternative part-ownership theory . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 43

7.    The district court erred in failing to adhere to the rules of evidence in resolving the ancillary petition and relied on anecdotal hearsay and misnomer language contrary to the

       LLCs' due process rights . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 44

8.     Constitutional limits to the forfeiture of innocently-owned
untainted property . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 49

9.     The district court erred in declining to consider Appellants'
jurisdictional objection that referral of the ancillary
proceedings to a magistrate judge without Appellant's
consent, or opportunity to withhold consent, including
delegation of the determination whether the defendant had
an interest in the property, exceeded the statutory
jurisdiction granted by 28 U.S.C. § 636(b)(1). . . . . . . . . . . . . . . . 52

C.    The district court erred in dismissing, on standing grounds, the vehicle
ownership claims of the ancillary petitioners who held title to cars found
by a jury to be untainted property, where the cars were consigned for
shipment to the car sales dealership, and prior dealer-use of the cars by
a company co-owner did not diminish the cars' value and terminated
prior to the government's substitute-asset forfeiture claim. . . . . . . . . . . . . . 57

CONCLUSION. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 61

CERTIFICATE OF COMPLIANCE WITH TYPE-VOLUME LIMIT . . . . . . . . 62

CERTIFICATE OF SERVICE. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 62

**TABLE OF AUTHORITIES**

**Cases**

*Alexander v. United States*, 509 U.S. 544 (1993) . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Bennis v. Michigan*, 516 U.S. 442 (1996) . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*Dowling v. United States*, 473 U.S. 207 (1985). . . . . . . . . . . . . . . . . . . . . . . . . 50

*Hervey v. R.I. Locomotive Works*, 93 U.S. 664 (1877) . . . . . . . . . . . . . . . . . . . 41

*Johnson v. New Destiny Christian Center Church, Inc.*,

      303 F.Supp.3d 1282 (M.D. Fla. 2018). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 42

*Klay v. Utd. Healthfroup, Inc.,* 376 F.3d 1092 (11th Cir. 2004) . . . . . . . . . . . . . 21

*McBoyle v. United States*, 283 U.S. 25 (1931) . . . . . . . . . . . . . . . . . . . . . . . . . 50

*Old W. Annuity & Life Ins. Co. v. Apollo Grp.*, 605 F.3d 856 (11th Cir. 2010) . . 42

*Pacheco v. Serendensky*, 393 F.3d 348 (2d Cir. 2004) . . . . . . . . . . . . . . . . . . . 44

*Roell v. Withrow*, 538 U.S. 580 (2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 53

*Swift v. Tyson*, 41 U.S. (16 Pet.) 1 (1842). . . . . . . . . . . . . . . . . . . . . . . . . . . 41

*Timbs v. Indiana*, 139 S.Ct. 682 (2019). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

*United States v. 7725 Unity Ave. N.*, 294 F.3d 954 (8th Cir. 2002) . . . . . . . . . . . 38

*United States v. A Single Family Residence & Real Prop.*,

      803 F.2d 625 (11th Cir.1986) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

*United States v. Aguilar*, 515 U.S. 593 (1995) . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Bajakajian*, 524 U.S. 321 (1998). . . . . . . . . . . . . . . . . . . . . . . 21, 51

*United States v. Barber*, No. 8:13–cr–28–T–24TBM,

2014 WL 5473570 (M.D. Fla. Oct. 28, 2014) . . . . . . . . . . . . . . . . . . . . . . 26

*United States v. Ben-Hur*, 20 F.3d 313 (7th Cir. 1994) . . . . . . . . . . . . . . . . . . . 37

*United States v. Bond*, 2015 WL 403102 (W.D. Mo. Jan. 28, 2015)

*United States v. Burnison*, 339 U.S. 87 (1950) . . . . . . . . . . . . . . . . . . . . . . . . . 59

*United States v. Cambio Exacto, S.A.*, 166 F.3d 522 (2d Cir. 1999). . . . . . . . . . 38

*United States v. Carrell*, 252 F.3d 1193 (11th Cir. 2001) . . . . . . . . . . . . . . . . . 43

*United States v. Coffman*, 612 Fed.Appx. 278 (6th Cir. 2015) . . . . . . . . . . . . . 32

*United States v. Davenport*, 668 F.3d 1316 (11th Cir. 2012) . . . . . . . . . . . . 32, 52

*United States v. Elbeblawy*, 899 F.3d 925 (11th Cir. 2018) . . . . . . . . . . . . . . . 21

*United States v. Foley*, 258 Fed.Appx. 246 (11th Cir. 2007) . . . . . . . . . . . . . . . 32

*United States v. Gamory*, 2010 WL 3880880 (N.D. Ga. Sept. 28, 2010) . . . . . . . 59

*United States v. Gilbert*, 244 F.3d 888 (11th Cir. 2001) . . . . . . . . . . . . . . . . . . 52

*United States v. Ginn*, 799 F. Supp. 2d 645 (E.D. La. 2010). . . . . . . . . . . . . . . 27

*United States v. Granderson*, 511 U.S. 39 (1994). . . . . . . . . . . . . . . . . . . . . . . 49

*United States v. Harris*, 989 F.3d 908 (11th Cir. 2021) . . . . . . . . . . . . . . . . . . 53

*United States v. Hasson*, 333 F.3d 1264 (11th Cir. 2003). . . . . . . . . . . . . . . . . 21

*United States v. Henry*, 621 Fed.Appx. 968 (11th Cir. 2015) . . . . . . . . . . . . . . 32

*United States v. Kennedy*, 201 F.3d 1324 (11th Cir. 2000). . . . . . . . . . . . . . 40, 44

*United States v. Klemme*, 894 F. Supp. 2d 113 (E.D. Wisc. 2012) . . . . . . . . . . . . 26

*United States v. Kozminski*, 487 U.S. 931 (1988) . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Lester*, 85 F.3d 1409 (9th Cir. 1996) . . . . . . . . . . . . . . . . . . . . 41

*United States v. McLaughlin*, 565 Fed.Appx. 470 (6th Cir. 2014) . . . . . . . . . . . 39

*United States v. Messino*, 122 F.3d 427 (7th Cir. 1997) . . . . . . . . . . . . . . . . . . 56

*United States v. Morgan*, 224 F.3d 339 (4th Cir. 2000) . . . . . . . . . . . . . . . . 32, 53

*United States v. Nava*, 404 F.3d 1119 (9th Cir. 2005) . . . . . . . . . . . . 35, 37, 40, 47

*United States v. One 1981 Datsun*, 563 F.Supp. 470 (E.D. Pa. 1983) . . . . . . . . . 59

*United States v. One-Sixth Share of James J. Bulger in All Present*

   *And Future Proceeds of Mass Millions Lottery Ticket No. M246233*,

   326 F.3d 36 (1st Cir. 2003) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 38

*United States v. Parcel of Land, Bldgs., Appurtenances & Improvements,*

   *Known as 92 Buena Vista Ave., Rumson, N.J.*, 507 U.S. 111 (1993) . . . . . 50

*United States v. Parenteau*, 647 Fed.Appx. 593 (6th Cir. 2016) . . . . . . . . . . . . 32

*United States v. Puche*, 350 F.3d 1137 (11th Cir. 2003) . . . . . . . . . . . . . . . . . . 31

*United States v. R.L.C.*, 503 U.S. 291 (1992) . . . . . . . . . . . . . . . . . . . . . . . . . 50

*United States v. Reckmeyer*, 836 F.2d 200 (4th Cir. 1987) . . . . . . . . . . . . . . . . 43

*United States v. Rogers*, 1996 WL 252659 (N.D.N.Y. May 8, 1996) . . . . . . . . . 59

*United States v. Rouhani*, 106 F. Supp.3d 1227 (M.D. Fla. 2015) . . . . . . . . . . . 40

*United States v. Seher*, 562 F.3d 1344 (11th Cir. 2009) . . . . . . . . . . . . . . . . . . 55

*United States v. Shefton*, 548 F.3d 1360 (11th Cir. 2008). . . . . . . . . . . . . . . . . . . 42

*United States v. Silva*, 15-20727-Cr-Gayles,

    2018 WL 5847348 (S.D. Fla. Sept. 6, 2018) . . . . . . . . . . . 10, 38, 39, 43, 44

*United States v. Smith*, 966 F.2d 1045 (6th Cir. 1992) . . . . . . . . . . . . . . . . . . . . . 42

*United States v. Timley*, 507 F.3d 1125 (8th Cir. 2007) . . . . . . . . . . . . . . . . 36, 38

*United States v. Totaro*, 345 F.3d 989 (8th Cir. 2003) . . . . . . . . . . . . . . . . . 37, 44

*United States v. Washington*, 2013 WL 3762906 (D.S.C. July 16, 2013). . . . . . . 59

*United States v. Weiss*, 467 F.3d 1300 (11th Cir. 2006) . . . . . . . . . . . . . . . . . . . 32

*United States v. Wyly*, 193 F.3d 289 (5th Cir. 1999) . . . . . . . . . . . . . . . . . . . . . . 40

*Uzuegbunam v. Preczewski*, No. 19-968,

    2021 WL 850106 (U.S. Mar. 8, 2021). . . . . . . . . . . . . . . . . . . . . . . . . . . . . 35

*Warburton v. White*, 176 U.S. 484 (1900) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 41

**Other Authorities**

U.S. Const., amend. V . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 30, 44, 49, 50, 55, 56

U.S. Const., amend. VI. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 47

U.S. Const., amend. VIII . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 51

18 U.S.C. § 1956(h) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 1957(f) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 3

18 U.S.C. § 3231 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

21 U.S.C. § 853 . . . . . . . . . . . . . . . . . 11, 25, 26, 36, 37, 42, 44, 62, 54, 55, 56, 59

21 U.S.C. § 881 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 32

28 U.S.C. § 636(b)(1)(B) . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . 24, 52, 53

28 U.S.C. § 1291 . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . xi

Fed. R. Crim. P. 32.2 . . . . . . . . . . . . . . . . . . . . . . 11, 22, 31, 40, 54, 55, 56, 59

**STATEMENT OF JURISDICTION**

The district court's jurisdiction arose pursuant to 18 U.S.C. § 3231 because Alvaro Tardon was charged with offenses against the laws of the United States and the district court entered a forfeiture order in that criminal case from which the ancillary forfeiture claims at issue in this appeal were presented under Fed. R. Crim. P. 32.2 and 21 U.S.C. § 853. This Court has jurisdiction over the appeal pursuant to 28 U.S.C. § 1291, which gives the courts of appeals jurisdiction over all final decisions of the district courts of the United States. The Appellants timely appealed from the orders dismissing their ancillary petitions. *See* DE:921, 939 (notices of appeal from dismissal order, DE:920, and final order of forfeiture, DE:935); DE:751 (notice of appeal from dismissal order, DE:747); and DE:945 (notice of appeal from dismissal order, DE:920, orders denying motions under Fed. R. Civ. P. 59, DE:934, 943, and final order of forfeiture, DE:935). This Court's order consolidating the appeals authorized Appellants to file an initial brief of no more than 20,000 words.

## STATEMENT OF THE ISSUES

Whether the district court erred in dismissing on standing grounds: (A) petitioner Collection Motor Sports of Madrid's ancillary forfeiture claim of ownership of company assets—consisting of untainted, automotive-themed wristwatches the company purchased for resale in connection with related luxury car sales—based on the government's misleading and untested claim that invoices provided to the car company by the watch seller did not correctly identify the watches, despite substantial support in the record, including the seller's deposition testimony and evidence offered by the government in the criminal trial, that the watches at issue were in fact the items sold and invoiced to The Collection; (B) ancillary claims of record title owners of investment real estate where the court concluded the petitioners—validly-formed and legally-operated LLC partnership entities—failed to exercise "dominion and control" over lawful, untainted partnership assets because the LLC partners delegated management responsibility to an LLC manager in compliance with Florida LLC statutes, rather than personally managing the U.S. entities from Spain; and (C) car ownership claims of the ancillary petitioners who held title to cars found by a jury to be untainted property, where the car purchases was funded by the corporate petitioner, the cars were consigned for shipment to the car sales dealership, and prior dealer-use of the cars by a company co-owner did not diminish the cars' value and terminated prior to government's substitute-asset forfeiture claim.

1

# STATEMENT OF THE CASE

## Course of Proceedings and Disposition in the District Court

Appellants Miamark LLC ("Miamark"), Murano 908 LLC ("Murano"), The Collection Motor Sports of Madrid ("The Collection"), Artemio Tardon ("Artemio"), Kyte Schooll (a Spanish corporation), and Maria Torrego, appeal from the dismissals, DE:747, 920, of their third-party ancillary petitions, DE:734, 735, asserting: as to Miamark and Murano, ownership of three Florida condominium units and proceeds of the sale of a fourth unit; as to The Collection, ownership of eight automobile-themed wristwatches; and as to Artemio, Kyte, and Torrego, ownership interests in two automobiles. As alleged in the petitions, Miamark owned Units 202, 502, and 2703 of the Mark Yacht Club Condominium (1155 Brickell Bay Drive, Miami); Murano owned Unit 908 of Murano at Portofino Condominium (1000 South Pointe Drive, Miami Beach); The Collection, a luxury car sales company, owned eight automotive-themed Audemars Piguet wristwatches; Torrego and Artemio owned a 2010 Rolls Royce Ghost automobile (VIN:SCA664S50AUX48905) (the "Rolls Royce"); and Torrego, Kyte Schooll, and Artemio owned a 2006 Mercedes–Benz SLR McLaren (VIN:WDDAJ76F06M000724) (the "Mercedes McLaren"). DE:734, 735; *see also* DE:631, 638.

### *Procedural History: Underlying Criminal Case*

The underlying criminal case commenced in Miami in July 2011 with the federal indictment of Alvaro Tardon ("Alvaro") on money laundering charges. DE:3. Alvaro proceeded to a jury trial on a superseding indictment, DE:203, charging

2

conspiracy, from 2001 to 2012, to commit money laundering under 18 U.S.C. § 1956(h) (Count 1), and conducting monetary transactions involving more than $10,000 in criminal proceeds, in violation of 18 U.S.C. § 1957(f), from September 2009 to June 2011 (Counts 2–14).

The indictment also sought forfeiture of "property in which ... Alvaro ... and Artemio ... have an interest" and alleged the property was "involved in" in the charged money laundering offenses or traceable to such property, including a list of automobiles, real estate, bank accounts, wristwatches, and jewelry. DE:203:5–11. The indictment alleged that the "value [of] the property involved in the violations alleged" was $26,443,771. DE:203:5. On May 21, 2014, the government filed an amended bill of particulars on forfeiture alleging that the property at issue "belong[ed] to" Alvaro, deleting any reference to ownership by Artemio. DE:455.

On June 11, 2014, a jury convicted Alvaro on all counts. DE:483. The forfeiture phase of Alvaro's jury trial commenced immediately thereafter. DE:484. On June 12, 2014, the jury rendered a verdict in the forfeiture phase, rejecting the government's forfeiture claims as to the property involved in this appeal, thus functionally acquitting as to the government's forfeiture claims regarding the relevant property (four condominium units, two cars, and eight wristwatches). DE:487; *see also* DE:536:124 (district court finds jury verdict "disposed one way or another with

3

every piece of property that's listed in the third bill of particulars").[1]

On August 15, 2014, just prior to Alvaro's sentencing hearing, the government filed a motion seeking a $14,358,639.64 forfeiture money judgment and substitute-asset forfeiture of the same property the jury found had no nexus to the criminal conduct. DE:550. The district court granted the money judgment request at sentencing, DE:608:6, but did not conduct a hearing, or rule, on the government's substitute-asset claim. DE:608:41 (noting defense request for evidentiary hearing on unresolved substitute-asset forfeiture issue).

After Alvaro's sentencing, the district court, on October 22, 2014, ordered substitute-asset forfeiture of the acquitted real estate at issue that the jury found was not involved in or traceable to the money laundering conspiracy. *See* DE:601. The district court then amended the order to account for trial attorney fees, DE:613, and on August 25, 2015, to change information about the wristwatches that the jury found to have no nexus to the offense, specifically to add purported serial numbers on the watches. DE:703. In granting forfeiture of the acquitted property, the district court denied Alvaro's request for an evidentiary hearing on whether he had any ownership interest in the properties and overruled Alvaro's statutory and constitutional

---

[1] The jury's forfeiture verdict found against the government as to every item of property at issue in this appeal. DE:487. Miamark sold Unit 202 prior to trial and deposited the proceeds into the court registry. DE:407; *see* DE:406 (parties stipulate that Miamark was the seller and that its manager was authorized to conduct the sale); *see also* DE:405 (district court orders parties to submit "documentation that [the manager] is authorized to sell the real property *on behalf of Miamark, LLC*" and that his counsel had a power of attorney) (emphasis added).

objections.  *See id.*

<em>Procedural History: Ancillary Petitions</em>

Appellants timely filed third-party petitions asserting their ownership of the condominium units, automobiles, and watches.  DE:623, 631, 637, 638.  Following substantial discovery conducted by the government, the petitions were set for an evidentiary hearing, which commenced on December 10, 2015.  DE:740.  After one day of testimony, the government produced discovery regarding the opinions to be offered by a newly retained Florida legal expert on LLC management; because the disclosures created a conflict of interest that required counsel for the petitioners to move to withdraw, the district court instead dismissed the petitions to permit the filing of new petitions by new counsel.  DE:745:46.

On January 14, 2016, Appellants refiled their petitions, consisting of the joint filing by Miamark and Murano as to the condominium units, DE:734, and the joint petition of Kyte, Artemio, and Torrego as to the automobiles and of The Collection as to the wristwatches, DE:735.  The government did not file a response denying the petition's allegations, but filed motions to dismiss with prejudice The Collection's claim to the wristwatches and Artemio's claim to the Mercedes McLaren.  DE:736, 737.

The district court granted the motions to dismiss with prejudice as to The Collection's claim to the wristwatches, DE:747, 761, and Artemio's claim to the Mercedes McLaren automobile.  DE:762.  As regards The Collection's claim, the

5

district court ruled that the petition was inadequate to satisfy statutory pleading requirements, despite the petition's allegations specifying relevant invoices and deposition testimony that were part of the underlying trial and forfeiture record in the case. DE:761:11. And as to Artemio's claim with respect to the Mercedes McLaren, the district court likewise ruled that the petition was inadequate to meet pleading requirements, despite the petition's allegations of Florida car title records and other transactional records showing transfer of title in June and July of 2011. DE:762:9–11.

Thereafter, on May 14, 2018, more than two years after the amended ancillary petitions were filed, the district court, acting sua sponte, entered an order referring "all pending motions and related pleadings" to a magistrate judge. DE:813. While the motions remained pending, the magistrate conducted an evidentiary hearing on February 19, 2019. DE:863.

*Magistrate Judge's Report and Recommendation*

On February 4, 2020, the magistrate judge entered a report and recommendation ("R&R") recommending denial of the real estate and automobile third-party claims for lack of standing. DE:906:5 ("Petitioners have not established that they are 'other than' the Defendant Alvaro …. Alternatively, Petitioners have not established that they have Article III constitutional standing because they are mere nominee owners with formal record title but without sufficient dominion or control over the properties. For all practical purposes, the facts demonstrating that

6

Petitioners failed to establish statutory standing are the same ones which reveal that they lack Article III standing.").

As to the LLC petitioners, the magistrate judge concluded they lacked standing principally because they had engaged Alvaro to serve as manager for the rental properties in South Florida. DE:906:57. According to the R&R, the fact that Alvaro had managerial status was somehow incompatible with the LLCs' exercise of dominion and control over the properties through a manager. *Id.* The magistrate judge found even though Alvaro's management may not have been unlawful or inconsistent with governing state law and thus would not meet the test for piercing the corporate veil, and even though there was no claim of diminution of the capital contributions or equity of the LLCs' owners or other harm to the LLCs or anyone else, nevertheless the LLCs' choice to allow Alvaro to be the designated manager in some way frustrated the punitive function of forfeiture law. DE:906:60.

*Appellants' Jurisdictional and Other Objections to the Report*

Appellants objected to the R&R on multiple grounds, including that the magistrate had: exceeded the scope of his statutory jurisdiction; disregarded state law on permissible LLC management; penalized the family members who owned the LLCs for having contributed to Alvaro's defense; ignored that the financial sourcing for the real estate purchases came from the LLC members, rather than Alvaro; disregarded the role of legal and other professionals who had structured the LLCs to operate in a lawful manner, with a manager; ignored that the LLCs pursued precisely

7

the investment objective for which they were formed; erroneously treated the condominium units and their handling as if they were involved in the underlying criminal activity, contrary to the forfeiture jury verdict; penalized the LLC members for failing to replace Alvaro as manager, when there was no obligation to do so; and placed dispositive weight on nominal references to Alvaro's managerial *title* (including a letter by an attorney and a motion by another attorney that *mistakenly* referred to Alvaro's managerial control as reflecting ownership interest), where none of those references was either materially misleading, contrary to Florida law, or even brought to the attention of the LLC members so they could correct the two errors, and where no person ever detrimentally relied on the managerial title. DE:909:7–10.

Appellants also objected that because the government's motion for substitute-asset forfeiture, DE:550, and the resulting forfeiture orders, DE:601, 613, 703, made no assertions or proffers regarding whether Alvaro had any cognizable interest in the properties (and the district court had made no findings on the issue), it was improper to delegate that sentencing question to the magistrate in the first instance and thus unfair to attribute to Alvaro ownership and place the burden on Appellants to disprove allegations against Alvaro that were rejected by the jury at the forfeiture phase of the criminal trial. DE:909:1–7.

In response to Appellants' objections, the government contended Appellants had no right to object to jurisdiction of the magistrate judge and that jurisdictional issues need not be resolved. DE:917:2–5. The government argued the fact that the

property at issue was conclusively found to be untainted by criminal impropriety and was not relevant to whether the record title owners could be divested of their property due to selection of a manager in accordance with Florida law, DE:917:7, and the fact that some *Murano* revenue was used to defend against the forfeiture of the Murano unit constituted evidence that *Murano* lacked standing. DE:917:13. The district court denied Appellants' unopposed motion for leave to reply. DE:915, 918.

*District Court Post-Hearing Order Dismissing Ancillary Petition*

On October 8, 2020, the district court entered an order overruling Appellants' objections and dismissing the Murano, Miamark claims for lack of standing. DE:920. The district court ruled that state law concerning whether the LLCs had been properly managed and operated was trumped by the magistrate judge's view that Alvaro, as manager of the LLCs, could be viewed as the properties' owner even if his actions as manager were lawful and proper under Florida LLC law and the Articles of Organization for the LLCs. DE:920:27–28 (citing decisions involving *criminal* use of *tainted* property by the criminal defendant; concluding that absence of any criminality or taint regarding the property, and its management, in the present case were not relevant to the decision not to be guided by Florida property and LLC law).

The district court did not address on the merits the objection that the magistrate judge lacked statutory jurisdiction to issue the R&R in this case and concluded instead that by first raising the jurisdictional issue in objections to the R&R, Appellants waived the jurisdictional issue. DE:920:33. The district court ruled the

9

magistrate did not err by obligating Appellants to prove "to the fullest extent" their ownership of the properties, even in the absence of competing evidence from the government, because LLC entity "claimants in forfeiture proceedings cannot rely solely on record title ownership and must establish dominion and control over the property in order to establish standing."  DE:920:36.

The district court overruled constitutional and other objections to the magistrate's reliance on the fact Alvaro's family members used "rental monies generated by the properties [*sic*]" to defray costs of the criminal prosecution, including the forfeiture allegations.  DE:920:42.

The district court found the acquitted, untainted status of the property did not limit the magistrate judge's reliance on case law addressing personalty or other property used for criminal or other improper purposes by a criminal defendant. DE:920:44.  The district court also concluded, contrary to the objections, that state law applicable to operation of an LLC could only be relied on "to determine a petitioner's interest in forfeited property after that petitioner establishes standing," and thus could not affect the determination whether manager Alvaro was a person distinct from the LLCs.  DE:920:47.

The district court concluded the ruling of another district judge in the Southern District of Florida addressing LLC ownership of condominium units—*United States v. Silva*, 15-20727-Cr-Gayles, 2018 WL 5847348 (S.D. Fla. Sept. 6, 2018)—made "no sense" in stating that a lawful LLC with recorded title to real estate has standing,

subject to both an opportunity for the government to pierce the corporate veil and proportional distribution of partnership interests to exclude any interest held by the defendant. DE:920:48–49.

The district court found no error in the magistrate judge's failure to make credibility findings regarding the evidence or to indicate a complete review of the trial record. DE:920:49–52. The district court found also that the magistrate did not err in discussing Miamark's interlocutory sale of Unit 202—which was authorized by the court—because he did not rely on that sale to resolve standing. DE:920:54.

The district court failed to address Appellants' objection, *see* DE:909:2, 19, that the magistrate had relied on the entirely mistaken theory that an operating agreement governed the affairs of Murano, when in fact no such operating agreement was signed or ever went into effect. The district court discounted the magistrate's repeated characterization of the title of managing member as connoting a partial ownership interest by Alvaro, when the governing documents for the company showed the only equity members of the LLCs were Artemio, Maria, and Nieves, and under Florida law, the articles of organization govern membership interests. DE:920:50 (magistrate judge "did not find that Alvaro's position as 'managing member' was evidence that he owned the LLCs as a matter of state law"). The district court failed to address Appellant's objection, *see* DE:909:27, that the magistrate mischaracterized trial testimony of Alvaro's wife that the LLCs owned the units. The district court also failed to address Appellants' objection, *see*

11

DE:909:24–25, that the magistrate judge mischaracterized the purchases of the Miamark units set forth in detail at the forfeiture phase of the criminal trial, which showed those units were always held for Spanish investors and a predecessor entity to Miamark which funded their purchase, not Alvaro.

The district court's order dismissing Appellant's ancillary petition adopted the R&R and found all other motions pertaining to the petition were moot.  DE:920:61. Appellants timely appealed from the dismissal order and from the final order of forfeiture, DE:935, entered thereafter by the district court. DE:921, 939.

### Statement of the Facts

The jury verdict in the forfeiture phase of the criminal case constituted a definitive rejection of the government's ancillary proceeding arguments suggesting criminal impropriety regarding the properties at issue.  *See* DE:487 (forfeiture verdict); DE:601:3, 5–7, 20, 25–26 (district court finds jury's decision on condominium units binding); DE:920:3, 5 (same).

The government's opposition to unequivocal evidence of Appellants' ownership of the units under Florida law was that the LLCs were actually the same person as defendant Alvaro—i.e., Appellants should be treated as if they do not exist—because Alvaro was selected by the LLC members to be the LLCs' manager, which required him to try to rent the units, using rent proceeds to pay condominium association fees and to maintain and preserve the condition and value of the units. Given the undisputed nature of the essential evidence in the case—i.e., that Alvaro

12

was the designated manager and helped to maintain the units for the LLCs—the magistrate judge made no credibility findings in his R&R.

The government conceded the record title owners of the properties are Murano (Unit 908) and Miamark (Units 202, 502, and 2703) and conceded the legal formation and existence of the Appellants as Florida LLC partnership entities. DE:826:11; Gov't Ex. 253, 255 (filed as DE:880-89, 880-91); DE:825:12, Gov't Ex. 244–48 (filed as DE:880-93 to 880-96 and 880-99); *see also* Gov't Ex. 265, 267 (filed as DE:880-81, 880-83).[2]

*Miamark—Units 202, 502, and 2703*

Miamark was established as a Florida Limited Liability Company (LLC) on January 17, 2006. DE:874-1 (Articles of Organization). Its initial business office was the Brickell Avenue law office of the attorney who drafted the organizational documents, Peter Lopez, who was also the original registered agent for the company. *Id*. Contributions to the LLC were to be made by majority vote of the LLC's three members: Artemio; his mother, Maria Lopez; and his sister, Nieves Lopez. *Id*. (Articles VII and VIII). The Articles of Organization—filed with Florida's Secretary of State and publicly available on Florida's Sunbiz website since their filing in 2006—provide if any of the three members dies, retires, declares bankruptcy, or withdraws, the LLC shall *terminate* absent agreement of the remaining two members.

---

[2] Government exhibits 244–48, 253, 255, 265, and 267, were also filed as Appellants' exhibits 1–9. *See* DE:874-1 to 874-9.

*Id.* (Article IX). Under "Article XII: Management," management of the company is reserved to: (1) the members (identified above); or (2) "*officers* of the members, who shall be referred to as managing members." *Id.* (emphasis added). Thus, the designation "managing member" was unequivocally meant to refer only to *a manager*, not an actual member or owner. Alvaro was named as the first manager, subject to replacement by the members. *Id.* His initial business address was that of the company's attorney; three years later, in July 2009, Alvaro's business office was changed to his home address near downtown Miami. *Id.* at 874-1:7.

Miamark's Operating Agreement, DE:874-2, was entered into and signed only by Miamark's three members—Artemio, Maria, and Nieves—and clearly excluded Alvaro from any ownership interest or ability to overrule any decision of the owners. *See id.* at 16 (Schedule B providing that each of the three members owns one-third of the company). The Operating Agreement expressly stated the purpose of forming the LLC was real estate investment, specifically as to "the Property" at issue, leasing and eventually selling the property at a profit, including "the investment, acquisition, management, operation and disposition of the Property; to own, hold, develop, farm, rent, operate, sell or otherwise dispose of the Property for profit." *Id.* at 3 (Article IV: "All the Property of the Company shall be owned by and in the name of the Company."). With regard to sales of Miamark's property, a unanimous vote of the members was required only if all or substantially all of the property was to be liquidated. *Id.* (Article V). All other sales and transactions were within the delegated

14

scope of authority of the manager elected by the members.  *Id*.

Most importantly, Section 5.2 of Article V of the Operating Agreement specified that "Managing Members need not be ... Members of the Company" and Alvaro's role, as the initial manager who could be replaced by majority vote of the members, was limited to managerial status.  *Id*. at 4.

Recorded deeds, prepared by Miamark's attorney Peter Lopez in 2006, conveyed to Miamark title to Units 202, 502, and 2703.  DE:874-3 - 874-5.  Fabiani Krentz, who initially closed on the Miamark units with funds provided by Artemio and other Spanish investors, deeded the units to Miamark in the months following the creation of Miamark LLC.  Specifically, FBI agents testifying for the government explained that Units 202, 502, and 2703 were initially purchased starting in the year 2000, when Krentz obtained purchase money mortgages and used down payment money provided by a group of investors that included members of the later-formed Miamark in what was then called Luxhouse International Rent Apartments Corp. DE:535:66–67 (testimony by FBI Agent Daniel Gaitan: "Yes, there were seven deposits made and totaling $35,380. ... So that was–the closing was done October 2001.  There was a wire transfer from Luxhouse International Rent Alcala.  This is a Spanish account."); *id*. at 69 (Gaitan:  "No. 2703.  This one, there was a series of escrow deposits made from Krentz, another wire from Valladares Garcia, and a wire from Artemio ... totaling $52,180 in the escrow account."); *see also* DE:75-1:15–16 (affidavit of FBI Agent Madeleine Albrecht stating: "In January of 2002, Lux House

15

International Rent Apartments Corp., (Lux House Miami) was incorporated in Florida. Krentz, Artemio and Maria Lopez, ... Artemio's sister, were the officers and shareholders"; "Artemio deposited almost 600,000 Euros ... into the Lux House Spain account. These funds were wired to the Lux House Miami account on April 4, 2002"; *"[m]ost of approximately 3 million Euros sent for Krentz to purchase real estate in Miami was deposited by **Artemio**"*) (emphasis added).

There was no showing that any money at all was invested by *Alvaro* in Miamark units or that any compensation he received for management work was inappropriate or excessive or harmed Miamark.

The government's evidence regarding rental of the units to pay expenses of the units, including high maintenance fees, taxes, and upkeep, confirmed the validity of Appellants' ownership interests. *See* DE:535:5 (testimony of Agent Gaitan at forfeiture jury trial that LLC bank account was "used to collect rents and then, from those rent payments, they were used to actually pay maintenance fees and other fees involved related to all the units there at the Mark building"). Miamark's complete banking records were introduced in evidence and showed normal deposits and withdrawals consistent with the rental purpose of the LLC. Gov't Ex. 2.

*Murano—Unit 908*

Murano was established as a Florida Limited Liability Company (LLC) on January 17, 2006 under Articles of Organization drafted by attorney Peter Lopez that followed the same form as those for Miamark. DE:874-6. Capital contributions to

16

the LLC were to be decided by majority vote of the three members: Artemio, his mother (Maria), and his sister (Nieves). *Id*. (Articles VII and VIII). The management of the company was left to the members or a manager selected by the members. *Id*. (Articles IX, XII). The designation "managing member" was unequivocally limited to refer only to an officer selected by the members, whose selection did not afford any membership or ownership in the company. *Id*. Alvaro was named as the first managing member, subject to replacement by the members. *Id*. The Murano members did not adopt an operating agreement, nor were they required to do so under Florida law. Murano obtained its recorded title ownership of Unit 908 by way of a warranty deed on January 25, 2006. DE:874-7 (deed from Ideal Properties, Inc. to Murano).

With regard to Unit 908, the testimony at the forfeiture jury trial revealed that mortgages taken out by Artemio and Krentz on a property owned by Contion LLC (an entity whose three-person membership was identical to the membership of Murano and Miamark) funded the purchase. DE:536:79 (government closing argument describing evidence regarding equity line from another apartment funding purchase of Unit 908); *see also* Gov't Ex. 240–242 (spreadsheets of funding for Unit 908 and other purchases); DE:713:74 (showing principal payoff check for purchase of Unit 908 was from an account in which Artemio and Maria were owners). At the criminal trial, Agent Gaitan explained: "Artemio Lopez Tardon is the one who's making a 798,000-plus loan payment on that mortgage." DE:525:26 (cited at DE:826-4:19). Agent Gaitan further stated: "Artemio, who had bought the property along with

Fabiani," transferred title to the LLC. DE:525:35 (cited at DE:826-4:28). Although the government argued to the forfeiture jury that the equity line proceeds used to buy Unit 908 were criminal proceeds, DE:536:79, the jury *rejected* the government's nexus argument.

*Ancillary Hearing Evidence*

At the evidentiary hearing, Appellants relied on evidence of their lawful existence and ownership of their properties and the funding and expense payment evidence introduced at the criminal trial, including specifically the forfeiture phase in which the jury found no nexus to the properties. DE:877-1:47 (relying on "complete record of the trial"). The government also relied on trial evidence and exhibits and presented approximately 30 pages of deposition testimony given by Alvaro regarding his work as manager of the LLCs. DE:880-44–50, 880:57–61 (Gov't Ex. 295–299, 306–08, 311–14). Alvaro explained, without contradiction, that his managerial work was intended for and served only the interest of the family members who owned the LLCs, that he received no unreimbursed compensation, and that his efforts preserved and maintained the LLC investments. *Id*.

The government, although it had also taken the deposition of Peter Lopez—the attorney who set up the LLCs, personally meeting with the members—did not offer Lopez's deposition, DE:702-4 (or Alvaro's complete depositions, DE:702-2, 702-3), in evidence. And although the government had taken statements from realtor Dayse Martins—who handled rentals for Appellants—and Fabiani Krentz, the government did not present their statements either. *See* Gov't Ex. 184, 205 (reflecting debriefing

18

of Martins and agreement with Krentz). The government introduced Miamark's interrogatory answers (but not Murano's) and introduced various lease agreements for Murano (but not Miamark). DE:880-51, 880-86 (Miamark's interrogatory answers, Gov't Ex. 305).

A 2007 lease agreement by Murano, offered by the government, showed that *Artemio* (not Alvaro) signed the agreement on behalf of Murano and rejected Murano's use of realtor Martins for the rental transaction. DE:880-86 (Gov't Ex. 260 at 2–11). Other Murano lease agreements offered by the government showed counsel for the Appellants (who also had a power of attorney from Alvaro) signing for Murano and the use of Sotheby's International as the realtor. DE:880-86:11–52.

The government offered a spreadsheet purportedly showing deposits and expenditures for Miamark's business bank account. DE:880-1:3–5 (pages from Gov't Ex. 252). The spreadsheet showed that nearly all of Miamark's revenue was used to pay Miamark's expenses or those of another LLC owned by Miamark's members and that the rent payments were deposited into Miamark's account. *Id.*

The government presented only one witness at the evidentiary hearing, Agent Gaitan, whose testimony mirrored his prior testimony at the forfeiture phase of the jury trial and included charts showing the acquisition and purchase of the relevant assets. DE:877-1:61–92. Agent Gaitan prepared as a demonstrative exhibit a timeline of those purchases and traced the funding for them. *Id*. at 64. The testimony confirmed the transactions described in the forfeiture jury trial as to Murano 908

19

LLC's purchase of its condominium unit.  *Id*. at 68–81.  The testimony also showed funds going from Spain (primarily *Artemio*) to a joint account in which two of the members of Murano 908 LLC (Artemio and his sister, Nieves) were joint owners with Alvaro, followed by use of those funds to purchase Unit 908.  *Id*. at 78.

Agent Gaitan also testified to his examination of real estate taxes for the units paid during 2010, which revealed that the bank account from which 2010 taxes were paid was jointly owned by LLC members Artemio and Nieves, and that approximately $2.5 million had been transferred to that account after it was wired from Spain.  *Id*. at 94, 96–103.  Agent Gaitan explained that none of those funds were sent by Artemio and others from Spain.  *Id*. at 129.  On cross-examination, Agent Gaitan explained that: he was "able to trace who sent that money" and the sources were "Artemio and other sources of income," but not Alvaro.  DE:877-1:129.

Agent Gaitan testified that Murano and Miamark are family-owned companies.  *Id*. at 124.  He also stated that the LLC members had, on at least some occasions, traveled to the United States.  *Id*. at 126.  Agent Gaitan could not recall whether Artemio personally wrote checks for LLC expenses.  *Id*. at 126–27.

At the evidentiary hearing—unlike the forfeiture phase of the criminal trial—the government did not elicit from Agent Gaitan any opinion based on his investigation as to whether Appellants were the true owners of the substitute properties or whether Alvaro had any ownership interest.  And despite interviewing numerous witnesses, the government presented no statement by any witnesses to the

effect that the interests claimed by the LLC members were invalid or inauthentic.

## Standards of Review

This Court reviews de novo the district court's legal conclusions regarding forfeiture, including interpretation of forfeiture statutes and related constitutional provisions. *United States v. Elbeblawy*, 899 F.3d 925, 933 (11th Cir. 2018); *United States v. Bajakajian*, 524 U.S. 321, 336 (1998). Factual findings by the district court as to forfeiture and constitutionality inquiries are reviewed for clear error. *Id.* In obtaining a preliminary order of forfeiture so as to warrant ancillary proceedings, the government's burden of proof was by a preponderance of the evidence. *United States v. Hasson*, 333 F.3d 1264, 1277 (11th Cir. 2003). A district court's procedural and evidentiary rulings in ancillary proceedings are reviewed for abuse of discretion. "A district court abuses its discretion if it applies an incorrect legal standard, follows improper procedures in making the determination," "makes findings of fact that are clearly erroneous," or "appl[ies] the law in an unreasonable or incorrect manner." *Klay v. United Healthgroup, Inc.,* 376 F.3d 1092, 1096 (11th Cir. 2004).

## SUMMARY OF THE ARGUMENT

The district court erred in dismissing The Collection's ownership claim as to untainted watches based on factual disputes belatedly raised by the government regarding whether the invoices for the watches testified to by the seller—and previously advocated by the government in the criminal trial as correlating to the watches—actually related to the watches the government sought to forfeit. Because the sworn ancillary petition adequately set forth facts showing that the watches

21

claimed were the items sold and invoiced to The Collection, the order of dismissal with prejudice was erroneous and should be reversed.

With regard to the real estate ownership by appellants Miamark and Murano, the district court erroneously concluded that a preliminary order of forfeiture of the property as substitute assets of a criminal defendant, entered in violation of Fed. R. Crim. P. 32.2 and in the absence of any factual determination of ownership interest of the defendant, established that the defendant's interest in the property was superior to the innocent owners' rights where the property lacked any nexus to criminal conduct, where the properties were purchased by the innocent owners with their own funds, and where the properties were managed lawfully through LLC entities, thus maintaining the innocent owners' dominion and control over the properties. The undisputed facts showed a family's investment in real estate with its own funds, not criminal proceeds. The jury verdict established that the property was not involved in or traceable to the alleged criminal activity of the defendant. There was no basis for divesting the lawful LLC entities of standing to assert their ownership of untainted investment real estate that was maintained for the substantial benefit and preservation of Appellants' investment interest.

The district court further erred in dismissing on standing grounds the vehicle ownership interest claims of automobile company Kyte Schooll and members of the Tardon family, where the dismissal was improperly premised on a failure to recognize undisputed evidence of the existence and operation of the Tardon car business and to give credit to the jury's forfeiture verdict upon hearing the relevant evidence.

**THE DISTRICT COURT ERRED IN DISMISSING, ON STANDING GROUNDS, THE ANCILLARY FORFEITURE PETITIONS OF THE RECORD TITLE OWNERS OF REAL ESTATE, AUTOMOBILES, AND OTHER BUSINESS PROPERTY.**

**A.** **The dismissal of The Collection's ancillary claim to untainted company property, consisting of eight automotive-themed wristwatches, was erroneously based on the government's misleading and untested claim that invoices provided to the car company by the watch seller did not correctly identify the watches, despite substantial support in the record, including the seller's deposition testimony and evidence offered by the government in the criminal trial, that the watches at issue were in fact the items sold and invoiced to The Collection.**

The district court erred in granting the government's motion to dismiss with prejudice The Collection's ancillary forfeiture petition claiming ownership of eight untainted, automotive-themed wristwatches purchased for resale in connection with the company's related luxury car sales on the purported basis that the petition failed to adequately allege "when and how" The Collection acquired the watches. DE:761:11. As set forth in the petition, DE:735:2 at ¶ 4, however, the Retadex invoices identified The Collection as the owner of the watches, as did the deposition testimony of Ulises Reyes, who sold the watches to The Collection. Moreover, both the invoices and the deposition testimony, which were previously submitted and

23

relied on by the government in the trial and criminal forfeiture proceedings, formed part of the record in the case.

The assertions made in the government's motion to dismiss, and relied on by the district court in its order, were thus internally contradictory and failed to support the petition's dismissal with prejudice. The motion acknowledged the petition's claims that The Collection was the owner of the watches based on the purchase of the watches as testified to in the deposition of Ulises Reyes, a deposition that is of record in this case, *see* DE:702-5 (Reyes deposition), as are the purchase receipts or invoices submitted by the government in that deposition as well as in the underlying criminal case. DE:636:13 (government, in its motion to dismiss, conceding that The Collection "alleges that the Watches were purchased" as described in the Reyes deposition); DE:736:8 (government recognizing that The Collection alleges the watches "were *sold* to The Collection on various dates, as reflected in part in relevant Redatex invoices and discussed in the Reyes deposition, including in 2009" and were owned by Petitioner) (quoting DE:735:2) (emphasis added). The government also acknowledged that the *government itself* relied on the Reyes invoices not only in the deposition in this case, but also extensively in the criminal forfeiture proceeding. DE:736:13 n. 8 (citing "the invoices in Government Exhibit 97," and examination of government witnesses regarding the invoices).

The government's positions taken in the criminal trial and in the forfeiture trial varied as to the watch invoices and whether they applied to the watches the government sought to forfeit. *See, e.g.*, DE:536:26, 33-34, 54-55, 81 (after taking the position that the watches belonged to the defendant because the original invoices

24

listed him, along with The Collection, prosecutor and government expert witness assert various positions regarding identification of watches on the "Redatex invoices," alternatively claiming that all of the watches were as invoiced, that all but one of the watches was as invoiced, that "many of them are listed on the Redatex receipts," and that the jury could assume that all of them are listed on the invoices).

Apart from the motion's internal contradiction, the grounds raised by the government and advanced by the district court were insufficient to support dismissal with prejudice. The government principally raised new factual disputes regarding whether the purchase invoices accurately reflected the information appearing on the invoices as testified to by Reyes, who testified that each purchase was made by The Collection and that the invoices reflected the accurate purchase price paid by The Collection for the watches. DE:702-5. However, the government cannot raise in a motion to dismiss factual disputes with its own witness or any other factual disputes. *See* DE:736:10(conceding that "at the pleading stage a petition's allegations need not be proven"). Importantly, the deposition testimony of Reyes showed that *all* of the watch invoices uniformly listed The Collection as the invoiced business entity for the watches. Nor, contrary to the district court, was The Collection's petition deficient in failing to attach a copy of the Redatex invoices and deposition testimony alleged in the Petition, where neither the applicable statute, 21 U.S.C. § 853(n)(3), nor relevant case law imposes such a requirement. Instead, the essential statutory requirement—a sworn statement of ownership, made under penalty of perjury—was appropriately fulfilled by The Collection in this case. *Id.*

The district court, in finding the petition was inadequately pleaded, relied on

25

three non-binding district court decisions that are materially distinct from the instant case. The petition in *United States v. Barber*, No. 8:13–cr–28–T–24TBM, 2014 WL 5473570, *3 (M.D. Fla. Oct. 28, 2014) (not reported), was dismissed where the petition asserted an interest in an account that was titled *exclusively* in the name of her husband, a codefendant, and failed to assert any factual *or* legal basis to support the petition's claim of ownership, thus failing to satisfy *both* technical and substantive pleading requirements. *Id.* In contrast to the petition in *Barber*, The Collection's petition alleged specified invoices and deposition testimony that expressly identified The Collection as the purchaser and owner of the eight wristwatches claimed in its petition—evidence that the government had *itself* submitted and relied on in the underlying trial and forfeiture proceedings, thus forming part of the record in the case. Moreover, unlike the circumstances in *Barber*, The Collection's petition was erroneously and unfairly dismissed, with prejudice, based solely on a purported pleading inadequacy, with no additional finding of a substantive deficiency on the merits that would preclude the claim. *Cf. Barber,* 2014 WL 5473570, at *3 (district court dismissing claim with prejudice where "*[n]ot only* does Petitioner fail to meet § 853(n)(3)'s pleading requirements, her reliance on section 61.075, Florida Statutes, to support her claim to the 401(k) fails.") (emphasis added).

*United States v. Klemme*, 894 F. Supp. 2d 113, 117 & n. 7 (E.D. Wisc. 2012), likewise is materially distinct from the instant case, where the third-party forfeiture claimant did not allege that she had purchased the shotgun in question, her unsworn assertion of when the gun came into her possession was contradicted by "the undisputed fact" that the defendant remained in possession of it at the time, and the

26

defendant's anticipated continued payments on the gun suggested his ongoing ownership of the item.  In addition, in *United States v. Ginn*, 799 F. Supp. 2d 645, 647–49 (E.D. La. 2010), two third-party forfeiture petitions were dismissed where neither was signed under penalty of perjury, contrary to the essential statutory requirement, and where the petitioners alleged only that the items claimed were obtained through employment and financial assistance—unlike The Collection's submission of a sworn petition supported by allegations of ownership shown by specified documents and testimony that form part of the case record.

Given all of the above considerations, the district court's dismissal with prejudice of The Collection's sworn petition alleging particularized documentary and testimonial support for its claim of ownership of untainted company property, consisting of eight automotive-themed wristwatches, was erroneous and should be reversed.

**B.** **The district court erred in dismissing, on standing grounds, the ancillary forfeiture petitions of the record title owners of real estate—the appellant partnership entities, which undisputed evidence showed were validly formed and legally operated—where the court erroneously concluded that the partnerships' lawful use of a manager, who maintained the partnerships' assets and function without excess compensation or diminution of partner interests, meant that the partnerships lacked "dominion and control" over the assets.**

Appellants, partnership entities formed under Florida law as limited liability companies (LLCs) to own investment real estate, had standing to litigate their record title ownership of their real estate in ancillary forfeiture proceedings, where:

- the LLCs were the lawful, record-title owners of the real estate under Florida law, and the criminal defendant never had any ownership interest in the property or the LLCs;

- all funding for acquisition of the LLC property came from resources of the member-owners of the LLC, not from the criminal defendant;

- the jury conclusively found the property was unconnected to criminal activity, i.e., the LLCs' use of a manager did not taint the assets;

- the LLCs were lawfully formed with assistance of reputable counsel who noted no improprieties and served as registered agent for them, after meeting personally with the members and finding their actions appropriate;

- the LLCs used a publicly-designated officer-manager, in accordance with Florida LLC law and the LLC articles of incorporation;

- the evidence at trial and in the forfeiture phase of trial, including of member funding and lawful LLC management of the assets, showed the LLCs held more than bare naked title to the real estate, and their dominion and control was established by successful rental of the properties and use of revenue to pay LLC obligations;

- the LLCs' manager received no excess compensation and preserved the partners' and entities' interests by using LLC revenue to pay debts and expenses of the LLC entities and the partners-members;

- when the manager was incapacitated or unavailable to personally perform (i.e., from 2009–2008 and from 2011–2021, amounting to

all but two years of the LLCs' 15-year ownership of the properties), other persons—including the members' sister-in-law/daughter-in-law; reputable realtors and attorneys; and the members themselves—took necessary management actions in the LLCs' interest; and

- not only was the Florida law standard for piercing the corporate veil not met, the government waived any alter-ego or other argument that the corporate veil could be pierced under state property or LLC legal standards given the conceded lawfulness of operation of the LLCs.

Undisputed evidence showed the Appellant LLCs were validly formed and legally operated. The district court concluded that lawful use of an LLC manager, who maintained the partnerships' assets and function without excess compensation or diminution of partner interests, somehow diminished the LLCs' "dominion and control" over the assets. The district court erroneously discounted the jury verdict exonerating the relevant properties and their management, where the jury's finding of the absence of criminal involvement barred the government from relitigating that rejected theory. The district court's dominion and control theory of ownership rights misapplied forfeiture law and the fundamental nature of state-law recognized property rights, and the court failed to properly consider the law and evidence favoring the rights, and showing the continued lawful existence, of the partnerships. The district court also wrongly discounted the propriety of the use of counsel in litigation and in management of property interests. The district court erroneously resolved jurisdictional issues in the improper delegation of authority to the magistrate judge

29

where the original substitute-asset forfeiture order was defective and could not be retroactively corrected by the magistrate.

The government's dominion and control theory—which posited, contrary to the law of Florida and every other jurisdiction, that LLC owners of innocent property must show personal involvement in the day-to-day management of the entities—was unfounded, because such entities always act through agents and where, as to the real estate in this case, the LLCs preserved their valuable investment, the sole exercise of dominion and control needed.

At all times, agents and professionals working for the Appellants preserved Appellants' valuable ownership of the properties. Divesting Appellants of standing based on management that served the precise function contemplated in their foundational corporate documents violates due process, the forfeiture laws, and procedural rules, and should be reversed.

1. *The government's in rem theory that the properties were used for an improper purpose was barred by the jury's forfeiture decision (applying a civil preponderance of evidence standard), where the jury's determination was binding in the ancillary proceeding under forfeiture law and res judicata principles.*

The district court erroneously treated the forfeiture-phase jury verdict as irrelevant to questions of standing. DE:920:45. The district court erred in discounting the verdict, because the jury's finding of *no criminal involvement* barred the government from relitigating that rejected theory in challenging the LLCs'

management, funding, and operation.

Unlike ancillary forfeiture cases cited by the district court, the jury's forfeiture verdict addressed and *acquitted every asset at issue here*, finding *no nexus* to the criminal activity and *no involvement* in the conspiracy. The properties' innocence foreclosed government claims of impropriety or irregularity. The district court's erroneous adoption of the government's in rem theory of liability to determine standing contravened the jury verdict.

Similarly, the district court's attachment of significance to the fact that the manager was convicted of offenses (of which the property itself was acquitted), *see* DE:906:58, as were others who had some prior connection to some of the property, *see* DE:906:40, 52, was at odds with the finality of the forfeiture jury's acquittal of the properties of any nexus to the criminal conduct.

The district court failed to acknowledge that acquittal of the assets in this case meant two things: (1) the properties were not tainted by criminal proceeds; and (2) the properties were not otherwise involved in the criminal activity. *See United States v. Puche*, 350 F.3d 1137, 1153–54 (11th Cir. 2003) (explaining separate taint and involved-in theories in money laundering offense). The real estate was both innocent in itself *and* had not been used, even innocently, in the money laundering conspiracy.

The jury verdict on the LLCs' properties' innocence of any nexus to the criminal activity, based on a preponderance of the evidence standard, is conclusive, as the district court's initial forfeiture order acknowledged. DE:601:3; *see* Fed. R. Crim. P. 32.2(b)(5)(B) (jury decides criminal "nexus" issues). The district court's

31

reliance on cases where courts found that forfeited properties were part of criminal activity, *see* DE:920:43–45, was therefore inapposite.[3]

Binding precedent of this Court holds that forfeiture matters decided in the criminal case—such as whether any of the funds used to purchase the properties at issue trace to the criminal activity—cannot be relitigated in ancillary proceedings. *See United States v. Davenport*, 668 F.3d 1316, 1321 (11th Cir. 2012). Thus, while in many cases involving ancillary proceedings as to substitute assets the government would be able to show, in challenging a claim, that the assets were acquired as part of the criminal activity and thus served some unlawful purpose disguised by record documents, that option was not available to the government here.

---

[3] This Court has focused on the showing that the property itself was untainted as a key factor in disproving government forfeiture theories. *United States v. Foley*, 258 Fed.Appx. 246, 247 (11th Cir. 2007) ("trustee could satisfy its burden of proof by proving that the funds" did not derive "from Foley's criminal activity"). *Cf. United States v. Parenteau*, 647 Fed.Appx. 593, 596, 598 (6th Cir. 2016) ("use of the insurance policies in [defendant's] bank fraud and money-laundering scheme"; "an integral part of his crimes"); *United States v. Coffman*, 612 Fed.Appx. 278, 286 (6th Cir. 2015) (claimant's name was used by defendant *for criminal purposes found by the jury*); *United States v. Morgan*, 224 F.3d 339, 344 (4th Cir. 2000) (wife's interest in joint bank account forfeitable given use of funds for illicit conduct of which defendant was convicted); *United States v. Henry*, 621 Fed.Appx. 968 (11th Cir. 2015) (*tainted* asset: marijuana found in car seized during search of defendant's residence was subject to forfeiture); *United States v. Weiss*, 467 F.3d 1300 (11th Cir. 2006) (*tainted* asset: mortgage bought with illicit proceeds; collateral estoppel applied to bar petition of innocent corporate owner claiming interest in criminally-forfeited mortgage based on prior judicial ruling that corporation did not own mortgage); *United States v. A Single Family Residence & Real Prop.*, 803 F.2d 625 (11th Cir. 1986) (*tainted* asset: residence bought with illicit drug proceeds; innocent owner defense not established in motion for return of seized property under 21 U.S.C. § 881).

The jury findings are binding under *Davenport* for purposes of ancillary forfeiture. And they are binding under *res judicata* and *collateral estoppel* principles as well. The district court was bound by the jury verdict, and relitigating the issues of the forfeiture trial was prohibited.

2. *The district court's dominion and control theory was legally unfounded, failed to recognize that use of managers and counsel for LLC activities is not only lawful, but is encouraged under Florida law, and was misapplied, where the court failed to properly consider the law and evidence favoring the rights, and showing the continued lawful existence, of the partnerships*.

The district court's dominion and control theory, that an LLC *entity* must show some unspecified exercise of physical dominion over investment real estate assets in order to maintain the entity's record title ownership interests—*and* that such dominion and control cannot be established through actions of a designated manager or hired professionals, but rather through personal conduct of the partners regarding the investment assets—is contrary to governing law protecting third-party ownership rights and ignores governing state law regarding the proof an opposing party must present to pierce the corporate veil as to *innocent* ownership of *untainted* assets.

First, the district court's theory was factually unfounded. Even assuming LLC owners must *personally* show involvement in LLC dominion over investment assets to maintain LLC ownership rights, the record shows abundant personal actions by LLC members that met such a test, including: *paying* for acquisition of the real estate,

33

engaging in international travel to effectuate the corporate measures necessary to perfect the real estate, hiring counsel and real estate professionals to protect their interests, traveling internationally to look after the property when the assigned manager was unavailable, using the real estate for temporary stays, and maintaining the real estate when the manager was out of the country or otherwise unable to assist.

Second, and most importantly, the district court's dominion theory has no place in evaluating an LLC's ownership of investment assets, as LLC law, common sense, and the LLC interrogatory answers introduced by the government showed. Where an LLC's sole purpose is to own real estate and limit liability, absent a failure of that purpose, lawfully-delegated LLC management is dominion and control by the LLC.

The evidence overwhelmingly showed effective management—that the manager preserved the assets, including in litigation, is why there was an ancillary forfeiture proceeding at all. There was no showing of any excess compensation, waste of revenue, or diminution of equity due to managerial control. To the contrary, the government complained that the managerial efforts were successful, including in the forfeiture-phase litigation. Not only was no managerial impropriety known to the members, there was unquestionable substantial compliance with managerial responsibilities to preserve the investments.

The district court's order makes it unclear what an innocent LLC owning innocent assets would be required to do in order to have standing if the criminal defendant is involved in management. Absent compliance with the state law tests, it is unsupportable to claim that a designated manager lacking ownership rights divests the entity of its own ownership rights simply by being a manager; such a tenet would

34

destroy Florida LLC protections and render the entire LLC structure meaningless.

In the present case, LLC members had ongoing contact with realtors Dayse Martins and June Savage, who rented out the units, and with attorneys who assisted. Dominion by the manager is dominion by the LLC. State law must govern whether such managerial control is consistent with maintaining the corporate identity of the LLC. The district court's rejection of state law on LLC management and piercing the corporate veil was erroneous.

Even where substitute assets have not been conclusively found to be untainted, the courts have rejected arguments for divesting the owner of property in the context of this case. *See United States v. Nava*, 404 F.3d 1119, 1134–35, 1136 (9th Cir. 2005) (there is "no case in which a court awarded ownership to someone who *never held title* and *did not live on the property*, in preference to the titled owner who occupied the property"; rejecting divestment of legal title based on the government's theory that "this is a bad family and that there are nefarious things going on") (emphasis added).

The Supreme Court recently held that "for the purpose of Article III standing, [even] nominal damages provide the necessary redress for a completed violation of a legal right." *Uzuegbunam v. Preczewski*, No. 19-968, 2021 WL 850106, at *7 (U.S. Mar. 8, 2021). Appellants, who have paid thousands of dollars in purchase money, maintenance, condominium fees, taxes, and legal fees to preserve the value of their investment in real estate, had standing in this case.

3.    *The district court employed a fundamentally erroneous, inapplicable theory of "bare naked title" that ignored and inaptly*

35

*depicted the relevant facts (including undisputed evidence that the partners' own assets were used to purchase the properties, rather than resources of the defendant), the law of the case, and the law pertinent to standing for real estate owners, and in imposing a burden of proof as to standing that exceeded the statutory requirement to show a legal ownership interest, particularly absent any taint affecting the property*.

The government, notably, did not dispute that the money for purchase of the relevant condominium units came from the three actual members/owners of the Appellant LLCs and that the rental proceeds from the units were used almost entirely to pay expenses relating to Appellants' ownership of the units. For example, deposition testimony, a hearing transcript regarding Krentz, DE:805-2, and the trial transcript, DE:535, 536, 713, all confirm that Krentz was acting for Spanish investors (principally LLC member, Artemio) in closing on the purchase of condominium units later conveyed to Miamark, and that the funds came from those investors. Testimony by Agent Gaitan showed that LLC member Artemio funded the purchase of the Murano unit.

The notion of bare naked title—which is in tension with the statutory requirement in any event[4]—was inapplicable where the properties' ownership and

---

[4] *United States v. Timley*, 507 F.3d 1125, 1130 n. 1 (8th Cir. 2007) ("Many courts have conflated § 853(n)(2) with § 853(n)(6). This is incorrect, as § 853(n)(6), by its language 'after the hearing,' assumes that a claimant has standing to petition for an ancillary hearing. A more accurate reading treats § 853(n)(2) as requiring an initial showing of a 'legal interest' to obtain an ancillary hearing and § 853(n)(6) as

purchase history were addressed and documented at length not only at the criminal trial generally, but specifically in the forfeiture phase of that trial where the properties and their acquisition were exonerated by the jury.

This is not a case in which the criminal defendant transferred his title to a nominal owner; instead, the actual partners funded the purchases, with the defendant having no ownership interest. *See, e.g.*, *United States v. Totaro*, 345 F.3d 989, 996 (8th Cir. 2003) (recognizing forfeiture is proper where property in which spouse might otherwise have interest was acquired with RICO proceeds; *applying New York law*); *United States v. Ben-Hur*, 20 F.3d 313, 314–15, 318 (7th Cir. 1994) (defendant divested himself of legal title, but continued to pay "all licenses, utilities, maintenance and repairs, insurance, and taxes"; *applying Wisconsin law*, court concluded defendant retained all "ownership 'sticks or rights' other than bare legal title") (citation omitted); *United States v. Nava*, 404 F.3d at 1127–28 ("We disagree that the notion of 'bare legal title' can be separated from the principle of 'legal title' and decided as a matter of federal law. Congress has not employed the phrase 'bare legal title' in § 853(n), but instead used the phrase 'legal right, title, or interest.' State law principles that determine 'legal right, title or interest' may or may not include some formulation of 'bare legal title,' but we are not free to adopt our own 'bare legal title' test as a matter of federal common law.").

The substantial record in this case of the existence of the LLC entities and the

---

requiring a showing of a 'superior legal interest' to prevail at the hearing. This difference is not pedantic, but essential to determining a court's power to conduct an ancillary hearing.").

history of the both formal and financial dealings that created meaningful ownership interests in the LLCs show more than a bare-naked title. Appellants are LLCs that serve the normal function of real-estate-holding LLCs; they were legally formed by an attorney acting in unquestioned good faith, for the very purpose of enabling foreign citizens to own valuable real estate. There was no showing of misuse of the companies for an improper purpose, and no showing either that Alvaro funded purchases or siphoned off net LLC revenue. Under any interpretation of the various doctrines for disregarding an entity, there is no basis for that here.

"[T]he requirements for a [petitioner] to demonstrate constitutional standing [to challenge a forfeiture] are very forgiving." *United States v. One-Sixth Share of James J. Bulger in All Present And Future Proceeds of Mass Millions Lottery Ticket No. M246233*, 326 F.3d 36, 41 (1st Cir. 2003). Courts have focused on whether a party had an ownership or possessory interest under state law at the time of forfeiture, *see*, *e.g.*, *United States v. Timley*, 507 F.3d 1125, 1129 (8th Cir. 2007), and "it is the injury to the party seeking standing that remains the ultimate focus," *United States v. Cambio Exacto, S.A.*, 166 F.3d 522, 527 (2d Cir. 1999). In general, any colorable claim on the property suffices, if the claim of injury is "redressable, at least in part, by a return of the property." *United States v. 7725 Unity Ave. N.*, 294 F.3d 954, 957 (8th Cir. 2002).

4. *The government's abandonment of alter-ego, nominee, and piercing-the-corporate-veil theories left no dispute as to the legal interest held, and thus the standing of, Appellants*.

The government abandoned the claim it had made in *Silva* that the LLCs were

*alter egos* of the defendant. *See* DE:906:17 n. 3 ("The United States did not attempt to demonstrate the alter ego theory through a piercing-the-corporate-veil analysis."); DE:906:27 n. 6. ("The United States did not pursue the alter ego theory in its proposed Report and Recommendations."). Prior to the *Silva* decision, the government had acknowledged in this case its burden as to "disregarding the corporate form, which is what we are doing as to the ... real estate petition." DE:745:43. The government's tactic changed when *Silva* clarified the evidence needed to pierce the veil under an alter-ego theory.

But the government's attempt to avoid the implications of the law and the facts in this case by convincing the district court to adopt the government's unworkable and constitutionally-offensive dominion and control test that no company could meet does not warrant discounting the traditional tests for preserving corporate identity.

5. <u>*Even under the standard used for tainted property, Appellants satisfied the most restrictive standing test*</u>.

Even where corporate entities have some involvement in the criminal conduct, unlike the forfeiture-phase exoneration of Appellants' property, courts have held that management by even part- or full-owner defendants does not warrant disregarding the separate legal interest of the entity. *See Silva*, 2018 WL 5847348 (rejecting government arguments for disregarding corporate existence despite defendant's managerial control and substantial ownership of substitute asset and failure to follow corporate formalities; Florida courts disregard corporate entity in only the most extraordinary cases of deliberate misuse of corporate form, tantamount to fraud); *United States v. McLaughlin*, 565 Fed.Appx. 470, 473, 476 (6th Cir. 2014) (reversing

forfeiture of corporate assets, where "the underlying business of [the corporations] was not deemed to be fraudulent" and where defendant, a 45% owner and president of the company, "did not personally benefit" from the corporation "beyond a few fringe purchases"); *United States v. Rouhani*, 106 F. Supp.3d 1227, 1230 & n. 1 (M.D. Fla. 2015) (applying alter-ego principles to reject forfeiture of corporate assets even though defendant "as its sole shareholder and president" clearly "exerted a high level of control" and "made all managerial decisions," where corporation had separate legal existence and generally conducted legitimate business).

An ancillary proceeding's "only purpose is to determine whether any third party has a *legal interest* in the forfeited property." Advisory committee's note to Fed. R. Crim. P. 32.2(b) (emphasis added). In evaluating the "legal right, title, or interest" in the forfeited property asserted by a claimant under Section 853(n)(6), courts look to state law. *See United States v. Wyly*, 193 F.3d 289, 304 (5th Cir. 1999) (evaluating property rights under state law in context of 21 U.S.C. § 853).

State law regarding legal interests is ordinarily controlling in an ancillary petition regarding untainted assets. "We can also assume that even though federal law decides what interests are subject to forfeiture under section 853, *state property law defines what those interests are in the first instance*." *United States v. Kennedy*, 201 F.3d 1324, 1334 (11th Cir. 2000) (emphasis added) (and cases cited therein); *see also Nava*, 404 F.3d at 1129 ("We begin with the obvious: [the claimant] has record title to the ... properties, and [the defendant] has never held record title to either property. ... Montana presumes that a person possessed of the record title is the lawful owner.").

40

There are few things as important to the states as guaranteeing the integrity of title to real property. *See Warburton v. White*, 176 U.S. 484, 496 (1900) ("Where state decisions have interpreted state laws governing real property, or controlling relations which are essentially of a domestic and state nature—in other words, where the state decisions establish a rule of property—this court, when called upon to interpret the state law, will, if it is possible to do so, in the discharge of its duty, adopt and follow the settled rule of construction affixed by the state court of last resort to the statutes of the state, and thus conform to the rule of property within the state."); *Hervey v. R.I. Locomotive Works*, 93 U.S. 664, 671 (1877) ("[E]very state has the right to regulate property within its limits."); *cf. Swift v. Tyson*, 41 U.S. (16 Pet.) 1, 18 (1842) (giving as example of "state laws strictly local" the "rights and titles to things having a permanent locality, such as the rights and titles to real estate, and other matters immovable and intraterritorial in their nature and character"). Property rights are a "part of the residue of sovereignty retained by the states, a residue insured by the Tenth Amendment." *United States v. Burnison*, 339 U.S. 87, 91–92 (1950).

Particularly where untainted assets are at issue, state property law governs ownership interests. *United States v. Lester*, 85 F.3d 1409, 1415 (9th Cir. 1996) (closely adhering to state property law "where the property subject to forfeiture is not connected in any way to the guilty spouse's criminal activities"); *Certain Real Property at 2525 Leroy Lane*, 910 F.2d at 349 ("forfeiture statutes are intended to impose a penalty only upon those who are significantly involved in a criminal enterprise").

Courts look to state property law to determine whether third parties have a legal right, title, or interest in the subject property. *United States v. Shefton*, 548 F.3d 1360, 1364 (11th Cir. 2008) ("[W]e apply state law to determine the nature of the Fund's interest in the Forfeited Property .... On the other hand, whether the Fund's interest in the Forfeited Property is superior and thus renders the forfeiture order invalid under § 853(n)(6) is a matter of federal law.") (internal citation omitted); *Old W. Annuity & Life Ins. Co. v. Apollo Grp.*, 605 F.3d 856, 862 (11th Cir. 2010) (holding that "Florida law supplie[s] the pertinent alter ego test" where government seeks to impose lien).

The principles applicable to the government's attempt to divest the LLCs of their interest in substitute assets in this case are governed by Florida law. As the court explained in *Johnson v. New Destiny Christian Center Church, Inc.*, 303 F.Supp.3d 1282, 1286 (M.D. Fla. 2018), the government faces a very heavy burden when it seeks to disregard the corporate entity. *See id.* at 1286–87 ("The key, therefore, is deliberate *improper* conduct. *See id.* This is required for all claims to pierce the corporate veil, whether they espouse alter-ego or sham corporation theories.").

At a minimum, where innocent property is concerned, unconnected to criminal conduct, reliance on state law to determine whether a partnership is the owner is essential. *See generally United States v. Smith*, 966 F.2d 1045, 1054 n. 10 (6th Cir. 1992) ("because forfeiture proceedings implicate property rights which have traditionally been measured in terms of state law, and because section 853 contains no rule ..., it is appropriate to refer to state law"); *Certain Real Property at 2525*

42

*Leroy Lane*, 910 F.2d at 348 (observing that "[p]roperty interests have long been acquired and defined by state law"); *cf. United States v. Carrell*, 252 F.3d 1193, 1204 (11th Cir. 2001) (sham ownership test is meant to address only "whether the record title owner is a 'strawman' set up to conceal the financial affairs of illegal dealings").

Here, however, the jury verdict precludes exactly that finding, thus leaving only the state property law tests as constitutionally permissible in the forfeiture process. *See United States v. Reckmeyer*, 836 F.2d 200, 208 (4th Cir. 1987) ("We conclude that in order to effectuate legislative intent the term 'bona fide purchaser for value' must be construed liberally to include all persons who give value to the defendant in an arms'-length transaction with the expectation that they would receive equivalent value in return.").

6.     *<u>The district court also erred in disregarding alternative part-ownership theory</u>.*

The LLCs had standing even if a drafting error in their formation documents gave the manager a 25% interest (by mislabeling him a "managing member"). The district court therefore erred in failing to consider Appellants' alternative request, *see* DE:909:2, that the members' proportional interests be evaluated so as to make a proportional distribution of LLC assets upon the court's disregarding of LLC form, as was done by the district court in *Silva*.

In granting the petition for ancillary relief in *Silva,* the district court made a proportional division of the LLC assets because the LLC was owned in part by the criminal defendant and her interest was subject to forfeiture, concluding that

equitable distribution of the net proceeds from the sale of the real properties at issue—with two-thirds of the proceeds going to claimants and one third going to the Government—effectuates the remedial purposes of 21 U.S.C. § 853.

The equitable distribution of interests in *Silva* is consistent with this Court's ancillary forfeiture precedent. *See Kennedy*, 201 F.3d at 1329 ("All parties agree that the government's interest, if any, is limited to Kennedy's one-half interest in the property."); *id*. at 1330 ("The statute asks whether a third party petitioner ever became a bona fide purchaser for value of the *defendant's* interest in the subject property. Finding that Mrs. Kennedy is a bona fide purchaser for value of her *own* interest in the tenancy by the entireties is not relevant.") (emphasis added); *see also Pacheco v. Serendensky*, 393 F.3d 348, 354–55 (2d Cir. 2004) ("If partial forfeitures are forbidden, then a criminal's activity may result in the forfeiture of an innocent third party's interest in property [and] may thus constitute an unconstitutional taking of a third party's interest or a deprivation of that party's property without due process ... ; *see also United States v. Totaro*, 345 F.3d 989, 999 (8th Cir. 2003) ('If this court were to deem forfeited the entire estate despite a valid claim of partial ownership by a third party, ... [i]t would ... punish the third party, against whom no jury has returned a verdict of guilt, and may therefore raise constitutional questions of a whole different order.') ... .").

7. *The district court erred in failing to adhere to the rules of evidence in resolving the ancillary petition and relied on anecdotal hearsay and misnomer language contrary to the LLCs' due process rights*.

In addition to applying an unwarranted dominion and control test, unreasonably redefining and misapplying a bare-naked-title theory, and discounting governing state law and the jury's forfeiture verdict of exoneration, the district court erred in adopting unfounded government claims regarding technical violations of an operating agreement for Murano. First, there was no operating agreement ever adopted by Murano, as attorney Peter Lopez's deposition showed (although the government failed to introduce his deposition). Second, Florida law does not require LLCs to have operating agreements. Of course, even if there had been such an agreement, any deviation from it by the manager was de minimis and inconsequential. But there simply was no such agreement, and that stubborn fact persists in the face of the erroneous dismissal order.

Also, the district court vaguely continued to claim some relevance to the Miamark and Murano articles of organization use of the term "managing member" to refer to a manager *who has no ownership* in the LLC. Filings that accurately reflect the manager's title as "managing member"—due solely to attorney Lopez's drafting choice, and having nothing to do with any other purpose—did not change ownership interests in the company and did not work any confusion on anyone. The government's reference to the "managing member" term, which attorney Lopez agreed with the government referred solely to management, not ownership, and was interchangeable with "manager," was irrelevant to standing.

Additional mischaracterizations of the record by the government included reference to Sharon Cohen's trial testimony, which was not meant to challenge LLC ownership claims or even offered for that purpose. If Cohen had believed Alvaro had

45

any ownership interest in Miamark properties, she would have included those properties as part of the financial settlement demands in the divorce proceedings, as she did with the forfeited marital home.

Other misstatements of the record by the government related to trial testimony by David Pollack (an associate of the Tardon family), who did not live in Unit 202 for two years beginning some time in 2010. The criminal docket shows that Pollack was incarcerated on July 14, 2011. And Pollack stayed in the unit only during a period when it could not be rented out due to restrictions imposed by the Mark Yacht Club Condominium Association. DE:825-3:158.

The district court's attack on the role of counsel was likewise unfounded and violated multiple constitutional guarantees. Use of counsel in litigation is presumptively proper. Use of counsel in management of property is presumptively proper. Disparagement of the role and person of lawyers cannot be a basis to disregard a properly formed LLC that substantially met its ownership purpose by fully preserving the value of its assets. When the LLC manager was incapacitated or unavailable to personally perform the role of manager (i.e., from 2009–2008 and from 2011–2021, amounting to all but two years of the fifteen years during which the LLCs have owned the properties), other persons—including the members' sister-in-law/daughter-in-law; realtors from reputable companies; reputable attorneys; and the members themselves—took necessary management actions to preserve and maintain the properties and to use revenue in accordance with the members' wishes. When counsel for Appellants assisted in management and preservation of the properties, the government conceded during the criminal case that "maintenance has

been paid [and] [t]here's been upkeep that's been done." DE:605:106 (disavowing any claim to proceeds of rentals by the LLCs). Even during proceedings on the original petition filed by Appellants, government counsel stipulated that counsel for Appellants "had a power of attorney *and was acting on behalf of these limited liability companies*" in management of the LLC assets. DE:745:34 (emphasis added).

All attorney actions were legitimate, indeed *unquestioned*, and *benefitted* the LLCs (e.g., properly establishing the entities and conveying title; showing they were not involved in the money laundering conspiracy). The district court created an unnecessary, but important Sixth Amendment issue by seeking to penalize a members' use of LLC property to fund the defense of their family member—where the district court claimed that by helping the defendant, the members were somehow effectively abandoning to him their ownership rights. The district court's misuse of familial support in this way is improper and would too greatly discourage such familial assistance and put a drain on access to counsel. The government's focus on the post-2011 use of LLC assets to fund the defense in this case is factually misplaced as well. Notably, the LLCs were likely to benefit from and have benefitted from the representation that they used their property to present, because as a result of hiring counsel, their assets may be preserved. Thus, whether from a self-interest or family-interest standard, helping Alvaro pay for counsel was understandable.

In *United States v. Nava*, the court rejected the theory that a defendant's mere assertions—unbacked by a showing the defendant's criminal assets were used to acquire the property—could divest the title owner of rights. 404 F.3d at 1133 ("Despite [the criminal defendant]'s representation to the government that he owned

both properties, his assertion of ownership in a plea agreement does not establish legal or equitable title under [applicable state] law. ... [The defendant's] plea bargain representation cannot establish his ownership. '[A] defendant's consent to forfeit property does not expand the Court's power over that property, if the property is not the defendant's own,' *United States v. Schwimmer*, 968 F.2d 1570, 1580–81 (2d Cir. 1992), for the obvious reason that he cannot agree to forfeit property that belongs to someone else."); *id*. at 1132–33 ("witnesses relied on hearsay ... and could not even identify with any certainty which property they were talking about."; divesting record title owner of property based on evidence that "is anecdotal, unclear, and contradictory" would be unconstitutional).

Along the same line was the district court's reference to an *argument* made by counsel for the criminal defendant early in the criminal case that the records of Alvaro's status as to the LLCs were in publicly-filed records. That criminal counsel noted the misnomer of "managing member" as potentially conveying an ownershp interest—in an argument that was part of a motion to suppress that was denied—cannot be the basis for divesting the owners of their property rights, much less their standing to assert such rights.[5]

---

[5]  Notably, the present version of Fla. Stat. § 605.0407 (2015) appears to approve the use, in appropriate contexts, of "managing member" for a non-member manager. *See* Louis T. M. Conti, Gregory M. Marks, *Florida's New Revised LLC Act, Part I*, 87-OCT Fla. B.J. 52, at 52 (Oct. 2013) ("One commonly misused definition from existing law, 'managing member,' was intentionally eliminated in the revised act. Too often, parties used that term without knowing what it meant and without understanding what consequences it had on other members in a member-managed LLC. The continued use of 'managing member' by LLCs in existence before the effective date is addressed in the revised act to make it clear that

More relevant is the fact, undiscussed by the district court, that until the final bill of particulars was filed, three weeks into the criminal trial, LLC member *Artemio* was identified by the government as an owner of the property (because his funds were a primary source of the purchase money).  *See*, *e.g.*, DE:203 (second superseding indictment).  That the government erased Artemio's name did not erase the fact that unlike the strawman and nominee cases cited by the government, the defendant was not the source of the purchase money in this case and the properties were untainted.

8.      *Constitutional limits to the forfeiture of innocently-owned untainted property*.

Requiring a petitioner in the forfeiture of *untainted* real property, lacking any nexus to criminality, to prove anything more than lawful existence under state law and record title ownership in order to proceed to show a greater interest than that of a non-title-holder violates due process.  And disregarding Florida law regarding the ownership of property and the viability of an LLC improperly intrudes on the state's rights.

To the extent the government argues for the most extreme and confiscatory view of forfeiture in this case, it is important to note there are constitutional limitations governing the interpretation and application of forfeiture law.  In the application and interpretation of the forfeiture statutes, due process compels strict construction of criminal punishment provisions, avoidance of constitutional doubt,

---

the term does not, in and of itself, make the LLC manager-managed.  ... For LLCs formed after the effective date, the term will not be used by the department in filings or annual reports."

and the rule of lenity. *See United States v. Granderson*, 511 U.S. 39, 54 (1994); *United States v. R.L.C.*, 503 U.S. 291, 305 (1992). The rule against reading ambiguous statutory provisions—such as the ancillary forfeiture requirement that the petitioner be a person other than the defendant—expansively is rooted in: (1) the principle, manifest in the text and structure of the Constitution, that the legislature, not the court, is to set the scope of criminal punishment, and (2) notions of "fair warning" that are at the heart of due process (and are particularly applicable here, given that their substantial compliance with Florida law provided LLC members every reason to believe lawful ownership of innocent property would not be subject to a novel dominion and control test that was beyond their contemplation). *See McBoyle v. United States*, 283 U.S. 25, 27 (1931); *United States v. Aguilar*, 515 U.S. 593, 600 (1995) (explaining that courts' "traditional ... restraint in assessing the reach of a federal criminal statute [reflects] both ... deference to the prerogatives of Congress, and ... concern that a fair warning should be given to the world in language that the common world will understand") (citing *Dowling v. United States*, 473 U.S. 207 (1985); *McBoyle*, 283 U.S. at 27); *United States v. Kozminski*, 487 U.S. 931, 952 (1988) (identifying "minimiz[ing] the risk of selective or arbitrary enforcement" as another "purpose[] underlying the rule of lenity"); *United States v. Parcel of Land, Bldgs., Appurtenances & Improvements, Known as 92 Buena Vista Ave., Rumson, N.J.*, 507 U.S. 111, 124 (1993) (rejecting "the Government's submission [that] would effectively eliminate the innocent owner defense in almost every imaginable case in which proceeds could be forfeited" because it "seems unlikely that Congress would

50

create a meaningless defense"; "the burden of persuading us that Congress intended such an inequitable result is especially heavy").

Equally important as a limiting constitutional principle is the Eighth Amendment's excessive fines clause, in its application to a family that allows one member to take the lead for them in investment management; punishment of such a "crime" by taking all of the property at issue is unduly excessive. *See United States v. Bajakajian*, 524 U.S. 321, 336–37 (1998) (disproportional forfeiture violates the Eighth Amendment). A majority of the Justices in *Bennis v. Michigan*, 516 U.S. 442 (1996), pointed to serious constitutional problems with the forfeiture of an *innocent* person's property absent a nexus between the property and the criminality. The question then is what did the LLCs or their members do wrong? *See Bennis*, 516 U.S. at 471 (Stevens, J., dissenting) ("[T]he forfeiture of petitioner's half interest in her car is surely a form of 'excessive' punishment. For an individual who merely let her husband use her car to commute to work, even a modest penalty is out of all proportion to her blameworthiness. When the assessment is confiscation of the entire car, simply because an illicit act took place once in the driver's seat, the punishment is plainly excessive."); *Timbs v. Indiana*, 139 S.Ct. 682, 686–87 (2019) (Eighth Amendment's "protection against excessive fines guards against abuses of government's punitive or criminal-law-enforcement authority"); *Alexander v. United States*, 509 U.S. 544, 558 (1993) (in personam criminal forfeiture is a fine under the Eighth Amendment).

The thin reed on which the district court relied to dispossess a family-owned

51

LLC of property its members paid for, and as to which they did nothing wrong, whether characterized as a standing decision or otherwise, presents significant constitutional concerns that should be avoided by a more reasonable interpretation of the forfeiture statutes as advanced by Appellants.

9. *The district court erred in declining to consider Appellants' jurisdictional objection that referral of the ancillary proceedings to a magistrate judge without Appellant's consent, or opportunity to withhold consent, including delegation of the determination whether the defendant had an interest in the property, exceeded the statutory jurisdiction granted by 28 U.S.C. § 636(b)(1).*

The government argued the magistrate judge had statutory jurisdiction to conduct the ancillary proceedings under 28 U.S.C. § 636(b)(1)(B), which permits referral to the magistrate judge of "any motion." DE:914:3. But an ancillary petition is not a "motion." It is an independent action addressing the fundamental right of a party to protect its interest in property, akin to a quiet title action.

Congress has provided that interested third parties may participate in a criminal-forfeiture proceeding, by asserting a "legal right, title, or interest." 21 U.S.C. § 853(n); *see United States v. Davenport*, 668 F.3d 1316, 1320 (11th Cir. 2012) (in an ancillary proceeding "a third party claimant can establish entitlement to return of forfeited property"). Because criminal forfeitures seek to "penalize the defendant for his illegal activities," such proceedings "reach[] only that property, or portion thereof, owned by the defendant," *United States v. Gilbert*, 244 F.3d 888, 919

52

(11th Cir. 2001), and not third-party property.

Although the district court was authorized to refer, as its order of referral indicated, pending motions in the ancillary proceeding, § 636(b)(1)(B) did not authorize a complete delegation of the ancillary proceeding to the magistrate judge, who engaged in a wide-ranging inquiry into not only the pending motions in the petition at issue, but also addressed proceedings as to the prior petition that had been dismissed and aspects of the substitute-asset decision that had not been reached by the district court at sentencing. *See Morgan*, 224 F.3d at 343 (district judge tasked with conducting ancillary proceedings takes into consideration trial evidence heard by court; thus, reliance can be placed on district court's findings premised on credibility determinations concerning evidence heard by that court).

The district court chose, however, not to address Appellants' jurisdictional objection, ruling that because it was presented in response to the R&R, there was no requirement to consider the jurisdictional error. DE:920:33. Contrary to the district court, jurisdictional issues should be addressed even absent the timing of the raising of the issue. *See*, *e.g.*, *United States v. Harris*, 989 F.3d 908 (11th Cir. 2021). Appellants contended they did not consent to magistrate jurisdiction. *See* DE:909:7. Even where consent to a civil trial before a magistrate is authorized, consent may not be implied absent notice of the right to refuse consent. *Roell v. Withrow*, 538 U.S. 580, 586 (2003).

In Appellants' case, the magistrate notably exceeded his jurisdiction by sua sponte choosing to make findings and address issues arising from a dismissed

ancillary petition as to which the district court had previously withdrawn referral to the magistrate, DE:686, 704, and by addressing evidence and documents never submitted at the hearing held by the magistrate. The magistrate had no jurisdiction over matters relating to the first petition, which was dismissed after a referral to the magistrate was rescinded in 2015. The magistrate re-inserted himself into proceedings with regard to a petition as to which his jurisdiction was removed and then made extensive use of portions of depositions that were not presented to the magistrate. *See* 44–51 (lengthily criticizing counsel for deposition matters not offered by the parties; implying some relevance to the standing issue).

The magistrate also exceeded his jurisdiction by reaching the criminal sentencing issue of whether the defendant had any interest in the property, where the district court, in violation of Fed. R. Crim. P. 32.2 and 21 U.S.C. § 853(p), had ordered preliminary forfeiture of substitute assets without making any finding or granting the requested hearing on whether the defendant had a property interest. In fact, the majority of the magistrate's analysis represents a punitive action in defiance of the forfeiture jury verdict, blurring the lines between making a finding of an interest by the defendant and finding whether the LLCs have a lawful existence and identity.

The statute governing ancillary proceedings clearly points to the district judge as the appropriate person both to conduct the hearing and to determine if the defendant has any interest in the property. *See* 21 U.S.C. § 853(n)(5) (forum for ancillary proceedings; "The hearing shall be held before the court alone, without a

jury."); 21 U.S.C. § 853(p)(2) (authority for substitute property forfeiture: "the court shall order the forfeiture of any other *property of the defendant*, up to the value of any property" found directly forfeitable due to a criminal nexus) (emphasis added). Although the rules provide for conducting the hearing within 30 days, and thus suggest a continuation of handling of the case by the trial and sentencing judge, this matter was held without action by the district court for two years after filing of the petition. Then, without input or opportunity to address jurisdiction, the court referred motions and pleadings to the magistrate, compounding the impropriety of the government's strategy to divest Appellants of their property without any showing, in its belated motion for substitute-asset forfeiture, DE:550, of the essential precondition that the defendant had any ownership interest. *See* 21 U.S.C. § 853(p). The government having failed to make any showing, or even argument, that the property at issue was owned by the criminal defendant, the district court also failed to make that finding, DE:601, rendering the substitute-asset forfeiture defective ab initio. *See* Advisory committee's note to Fed. R. Crim. P. 32.2(c) (2009) (district court's "preliminary order may include substitute assets *if the government has met the statutory criteria*") (emphasis added); *United States v. Seher*, 562 F.3d 1344, 1373 (11th Cir. 2009) (only "Seher's property could be a substitute asset for the personal money judgment").

Having erred in failing to consider defects in the entry of the substitute-asset forfeiture order, the district court further erred by failing to grant a hearing on the forfeiture issue of the property's ownership as required by Fed. R. Crim. P. 32.2 and due process. *See* Fed. R. Crim. P. 32.2(B)(1)(B) ("If the forfeiture is contested, on

either party's request the court must conduct a hearing after the verdict or finding of guilty."). Shifting to the magistrate the role of conducting the initial inquiry as to whether the defendant had an interest in the properties violated 21 U.S.C. § 853 and Fed. R. Crim. P. 32.2 and due process where the defendant was not permitted party participation in the proceedings and Appellants were denied standing.

Thus, in the present case, the forfeiture order was entered even though the jury found no nexus to the asserted criminal conduct and the district court failed to find the defendant's ownership interest. The true owners of the property were then wrongly placed in the position of having to re-prove that their use of a manager was not improper simply in order not to be divested of their property.

At least one Circuit has reasoned that where no finding is made or evidentiary basis shown by the government, prior to issuance of a preliminary substitute-asset forfeiture order, for attributing property ownership to a criminal defendant, the government's burden in the ancillary proceeding likely extends to showing by a preponderance of the evidence that the defendant actually has an interest in the property. *See United States v. Messino*, 122 F.3d 427, 428–30 (7th Cir. 1997) (following entry of preliminary order of forfeiture of a motorcycle as substitute property, third party claimed ownership and argued district court erred in requiring claimant to prove his ownership where district court had improperly issued the order of forfeiture). The Seventh Circuit stated the third-party claimant had a "strong argument" in its challenge to forfeiture because "the government apparently did not present any evidence with its motion for forfeiture of substitute assets [that] ... the property sought was [the defendant's] property." *Id.* (reversing on other grounds).

56

The multiple defects in the district court's handling of the substitute-asset forfeiture in this case warrant reversal.

**C.** **The district court erred in dismissing, on standing grounds, the vehicle ownership claims of the ancillary petitioners who held title to cars found by a jury to be untainted property, where the cars were consigned for shipment to the car sales dealership, and prior dealer-use of the cars by a company co-owner did not diminish the cars' value and terminated prior to the government's substitute-asset forfeiture claim.**

The district court erroneously concluded that "Maria Tardon, Artemio Tardon, and Kyte Schooll are not 'other than' [the defendant]," DE:906:73, and that they "have not claimed that they paid for the vehicles." DE:906:72. Both assertions are incorrect. First, the characterization of indicted co-defendant Artemio Tardon as not "other than" than his brother Alvaro Tardon is contrary to the evidence the government offered at trial that clearly treated Artemio as having a status and assets independent of his brother. The district court also erred in failing to acknowledge the abundant showing at trial of the existence and operation of Spanish corporate entity Kyte Schooll, of which Artemio is and has been an owner since he founded it. At trial, the government introduced substantial evidence that Artemio and Alvaro were partners in the automobile business, that Artemio—in Spain—managed assets and funds pertaining to Kyte Schooll (the umbrella corporation that purchased the luxury cars for resale), and that Artemio had very large amounts of money and had, in fact, failed to pay income tax on his substantial earnings.

The testimony of attorney Luis Aguado in the district court's initial hearing on the ancillary claims confirmed Artemio's business role in the car business. DE:740:66. The government also produced at trial extensive multi-year records of Kyte Schooll operations and finances. DE:525:91; DE:524:124; *see also* DE:524:66 (government elicits testimony that "Kyte School[l] is a company that is formed – that was formed by Artemio."). And at the forfeiture component of the criminal trial, Agent Gaitan conceded that Kyte Schooll provided the funding for the purchase of the Mercedes McLaren automobile at issue, while other car business-related entities provided funds for the Rolls Royce automobile. DE:713:60; DE:713:47–48. Contrary to the district court's finding that "exclusive reliance on title documentation" was the sole basis for assertion of standing as to ancillary claims to the cars, *see* DE:906:66, the totality of the criminal trial (and particularly the forfeiture component of the trial that functionally acquitted the Mercedes McLaren and the Rolls Royce) abundantly established business ownership of the vehicles purchased by the business (Kyte Schooll) and eventual resale or listing for resale of such vehicles. DE:532:35 (testimony elicited by the government regarding more than 160 luxury vehicle sales in approximately three years of business operations). Clearly, any assertion that Artemio was a non-entity in the car business or that Kyte Schooll did not prove that it had paid for the Mercedes McLaren lacks any support in the record which unequivocally showed the contrary.

Importantly, Alvaro is a partner in the Kyte Schooll entity and the car dealership; his apparently minimal use of the car following its purchase did not divest Kyte Schooll of its ownership interest that has always been reflected on the title

records for the Mercedes McLaren. Some use of the vehicle even for test drives, rather than idleness, is a normal practice. And because the totality of the criminal trial record refutes the erasure of Artemio from the status of car business owner who was personally on the title to the Mercedes McLaren, the district court's standing findings and conclusions as to the vehicles at issue cannot be upheld.

Non-precedential authorities cited by the district court are not to the contrary. *See* DE:906:71 (citing *United States v. Gamory*, 2010 WL 3880880 (N.D. Ga. Sept. 28, 2010); *United States v. Rogers*, 1996 WL 252659 (N.D.N.Y. May 8, 1996); *United States v. Bond*, 2015 WL 403102 (W.D. Mo. Jan. 28, 2015); *United States v. Washington*, 2013 WL 3762906 (D.S.C. July 16, 2013); *United States v. One 1981 Datsun*, 563 F.Supp. 470 (E.D. Pa. 1983)). In none of the cited cases (all of which concerned tainted property, not property found by the jury in this case to have no nexus to the 10-year long indicted conspiracy) was the claimant the actual purchaser of the vehicle or engaged actively in the car sales—unlike the circumstances as to Kyte Schooll. Further, none of the cited cases involve a car business operator's temporary use of dealer inventory—a common practice even outside the luxury car market. Instead, the cited cases deal with actual straw men owners who lacked any real connection to vehicles, much less purchased or funded them as did Kyte Schooll and the half-owner of the car businesses, Artemio Tardon.

In failing to reach the merits of the automobile claims, despite abundant evidence fully distinguishing the nominee cases cited by the government, the district court failed to afford meaningful review of the claims as required by 28 U.S.C. § 853 and Fed. R. Crim. P. 32.2. Agent Gaitan testified at the criminal forfeiture trial that

Claimant Kyte Schooll is a family-owned business. DE:877-1:124. Kyte Schooll and related car business entities provided the funds to purchase the Mercedes McLaren (*see* Kyte Schooll wire transfers, DE:550-6:3) and the Rolls Royce (Spanish car companies provided the funding by wire transfer, *id.*). With regard to the Mercedes McLaren, the government proved that all of the purchase money was provided by Claimant Kyte Schooll in four wire transfers amounting to $343,700. DE:713:60; Gov't Trial Ex. 218. The government's post-trial motion for forfeiture attached a chart showing every single payment by Kyte Schooll to purchase the the Mercedes McLaren. DE:550-6:3 (showing wire transfers from Kyte Schooll to Rick Case Honda from Feb. 21–23, 2007). The government conceded that Kyte Schooll has always been listed as an owner in the titling of the the Mercedes McLaren. The government conceded in the ancillary proceedings that under Fla. Stat. § 319.22, only a "'titled owner ... according to Florida motor vehicle records'" has "'an interest in the vehicle that may be recognized in the courts of the State of Florida.'" DE:737:12. Taken together, this evidence, which the district court failed to treat as binding, including as to the jury's forfeiture verdict, shows that Kyte Schooll has much more than a nominal interest in the Mercedes McLaren and that its interest was properly protected, and not injured or impaired, by any action taken by Kyte Schooll's owners, thereby fully satisfying any need in this context for a further showing of corporate dominion and control.

With regard to the Rolls Royce, two Spanish car companies with ties to the Tardon family or their car businesses provided the funds. *See* DE:713:47–48 (Agent Gaitan explains that Cars Boats Madrid SL wired $315,960 to Braman Motors for the

Rolls Royce); *id.* at 56 (noting additional $49,000 from The Collection Exotic Cars went to the purchase of the Rolls Royce); DE:550-6:3 (government exhibit showing purchase funded by car dealer Cars Boats Madrid SL); DE:536:69 (counsel for the United States admits: "'[W]e have two separate wires going to purchase an automobile [the Rolls Royce]—a luxury automobile *that was then titled in the name of a company*.'") (emphasis added).

Trial testimony that while Alvaro was going through a divorce proceeding, he sought to ship various vehicles to Spain, communicating with the general manager for The Collection Motor Sports regarding those proposed shipments for business use of the cars, DE:877-1:112–13, did not undermine the standing of the owners, where the action worked to preserve the existing ownership interest from any competing claim in the divorce. Sharon Cohen's testimony, and that of David Pollack, DE:776-9:18, showed the reason for shipping cars to Spain was to advance the Tardon family's car business, which had millions of dollars in sales and two showrooms, including highly profitable transactions. *See* DE:531:6–62; DE:532:95-130 (testimony of Patricia Scheel). The district court's dismissal on standing grounds erroneously ignores the undisputed evidence of the existence and operation of the Tardon car business and fails to give credit to the jury's forfeiture verdict upon hearing the relevant evidence.

## CONCLUSION

For all the reasons set forth above, the dismissal of the ancillary petitions filed by Appellants should be reversed.

Respectfully submitted,

 s/ Jacqueline E. Shapiro
JACQUELINE E. SHAPIRO, ESQ.
Attorney for Appellants
40 N.W. 3rd Street, PH 1
Miami, Florida 33128
Tel. (305) 403-8207

## CERTIFICATE OF COMPLIANCE

I CERTIFY that this brief complies with the type-volume limitation of FED. R. APP. P. 32(a)(7). According to the WordPerfect program on which it is written, the numbered pages of this brief contain 16,172 words, which is within the 20,000-word limit set by this Court on June 23, 2021 in its order consolidating these appeals.

 s/ Jacqueline E. Shapiro
Jacqueline E. Shapiro

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this  17th  day of April, 2024, the foregoing was filed electronically and thereby served upon counsel of record.

 s/ Jacqueline E. Shapiro
Jacqueline E. Shapiro